# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
|  | Case No.: 19-10210 (__) |
| Charlotte Russe Holding, Inc., *et al.*,[1] | (Joint Administration Requested) |
| Debtors. |  |

## DECLARATION OF BRIAN M. CASHMAN, CHIEF RESTRUCTURING OFFICER OF CHARLOTTE RUSSE HOLDING, INC., IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Brian M. Cashman, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Berkeley Research Group LLC ("BRG").[2] On September 20, 2018, Charlotte Russe, Inc., a Delaware corporation, retained BRG as financial advisor to assist in evaluating potential restructuring alternatives. Subsequently, on January 31, 2019, the Debtors hired me as Chief Restructuring Officer, subject to Court approval in these chapter 11 cases. In my capacity as a financial advisor and Chief Restructuring Officer of the Debtors (subject to Court approval), I am familiar with the Debtors' day-to-day operations, books and records, business, and financial affairs.

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Charlotte Russe Holding, Inc. (4325); Charlotte Russe Holdings Corporation (1045); Charlotte Russe Intermediate Corporation (6345); Charlotte Russe Enterprise, Inc. (2527); Charlotte Russe, Inc. (0505); Charlotte Russe Merchandising, Inc. (9453); and Charlotte Russe Administration, Inc. (9456) (collectively "Charlotte Russe"). The Debtors' headquarters are located at 5910 Pacific Center Boulevard, Suite 120, San Diego, CA 92121.

[2] Information on my qualifications can be found in the Debtors' *Motion for an Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, Authorizing the Debtors to Retain Berkeley Research Group LLC as Financial Advisor, and (II) Designate Brian M. Cashman as Chief Restructuring Officer* Nunc Pro Tunc *to the Petition Date, and Approving the Agreement Related Thereto*, dated the same day hereof (the "BRG Application").

2.    I submit this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and motions filed on the date hereof seeking various types of "first day" relief, as well as in support of the Sale Motion (as defined below), and to provide an overview of the Debtors' business and their need to pursue an orderly sale process pursuant to section 363 of the Bankruptcy Code.  The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including Cooley LLP ("Cooley") and Guggenheim Securities, LLC ("Guggenheim Securities"), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or my opinions based upon my experience and knowledge.  I am over the age of 18 years and duly authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4.    On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Motions").  I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Motions and Sale Motion.

5.    The First Day Motions are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of these cases.  Among other things, the First Day Motions are designed to meet the Debtors' goals of: (i) continuing their operations in chapter 11

with as little disruption and loss of productivity and value as possible; (ii) maintaining the confidence and support of their customers, employees, vendors and service providers; and (iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases. I have reviewed the First Day Motions, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' business, and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

6.      This Declaration provides an overview of the Debtors' business, capital structure, the proposed debtor-in-possession ("DIP") financing, and the circumstances giving rise to the commencement of these chapter 11 cases, and summarizes the relief requested in each of the First Day Motions.

**THE DEBTORS' BUSINESS**

7.      Charlotte Russe is a specialty fashion retailer of young women's apparel and accessories comprised of seven entities.  A chart reflecting the Debtors' corporate structure is annexed hereto as **Exhibit A**.

8.      For over 40 years, Charlotte Russe has been a leading women's specialty fashion retailer, offering the latest trends at an affordable price point.  The Debtors are headquartered in San Diego, California and have one distribution center located in Ontario, California.  In addition, the Debtors lease office space in Los Angeles, California and San Francisco, California, where they primarily conduct merchandising, marketing, e-commerce and technology functions.  The Debtors sell their merchandise to customers in the contiguous 48 states, Hawaii, and Puerto Rico through their online store and 512[3] Charlotte Russe brick-and-mortar stores located in various regional malls, outlet centers, and lifestyle centers.

---

[3]  Excludes two closed stores planned to be relocated and reopened with signed leases.

9.      The bulk of the Debtors' apparel and accessory products are sold under the Charlotte Russe brand with ancillary brands for denim and perfume (Refuge), young women's plus-size apparel (Charlotte Russe Plus), and cosmetics (Charlotte by Charlotte Russe).  These brands each focus on the Debtors' guiding principle of "Trend + Speed + Value" in order to provide the latest trends in young women's clothing at affordable prices to the Debtors' target demographic of teenagers and young adults in small and mid-size geographic markets.

10.     Through the Charlotte Russe brands, the Debtors offer a variety of products such as tops, bottoms, dresses, shoes, accessories, jewelry, cosmetics, fragrances, intimates, and outerwear, which can each be found in any of the Debtors' stores.  The Debtors continually update their merchandise and floor sets based on the latest fashion trends.

11.     The Debtors acquired the Peek brand in 2016, which offers playfully inspired designer clothing for babies, boys, and girls ranging in age from infant to 12 years old.  The Peek brand allows the Debtors to reach a secondary market, offering an array of premium children's apparel and shoes as well as toys and accessories.  The Debtors operate ten[4] Peek store locations in seven states as well as an e-commerce website, www.peekkids.com.  Peek is also distributed at wholesale to a few third-party retailers, most significantly Nordstrom.

12.     As a fast-fashion retailer, the Debtors need to consistently remain on-trend with the latest fashion.  The Debtors track fashion and style influencers, as well as social media personalities, and work to forecast and monitor new trends in the marketplace.  Most merchandise is purchased from vendors in the United States.  The Debtors' vendor base changes over time depending on current trends in fashion and availability of goods.

---

[4] Excludes one closed store planned to be relocated and reopened with signed lease.

13.     The Debtors maintain control over their proprietary brands by sourcing, fitting, marketing, and selling their own merchandise; they do not license the Charlotte Russe or Peek brands to any third parties.  Through their unique product development strategy, which ensures popular, consistently fitting, and fashion-forward merchandise in stores for the right price, Charlotte Russe retains its customers' loyalty.

## CAPITAL STRUCTURE[5]

14.     The Debtors are borrowers under two credit facilities, namely, (a) a first lien revolving credit facility and (b) a second lien term loan facility, each as described below.

## I.    The Prepetition ABL

15.     Each of the Debtors is indebted under that certain Second Amended and Restated Credit Agreement, dated as of May 22, 2013 (as amended, supplemented or otherwise modified from time to time, the "Prepetition Loan Agreement") by and among Charlotte Russe Holding, Inc., Charlotte Russe, Inc. ("Borrower"), as borrower, Charlotte Russe Merchandising, Inc. and Charlotte Russe Administration, Inc. (collectively, "Guarantors"), as guarantors, Bank of America, N.A. (the "Prepetition ABL Agent"), as agent, and the lenders party thereto (the "Prepetition ABL Lenders" and together with the Prepetition ABL Agent, the "Prepetition ABL Parties").  The Prepetition Loan Agreement provides for an asset-based revolving credit facility of up to a maximum of $80 million in the aggregate (the "Prepetition ABL Loan").  The Prepetition ABL Loan accrues interest at a rate of LIBOR plus 6.75% and matures on February 22, 2022.  The Debtors' ability to borrow under the facility is further subject to a borrowing base calculation contained in the Prepetition Loan Agreement.

---

[5] The summary of the loan documents and security agreements set forth herein is qualified in its entirety by the documents themselves.  To the extent there is a discrepancy between the descriptions set forth herein and the documents, the documents control.

16.     On October 1, 2018, the Borrower, Guarantors, and the Prepetition ABL Agent, in such capacity, executed a sixth amendment to the Prepetition Credit Agreement, the net effect of which was to temporarily suspend the minimum availability requirement under the agreement for the period of October 1, 2018 to November 30, 2018.

17.     As of the Petition Date, the Debtors owed approximately $22.8 million under the Prepetition Loan Agreement, exclusive of accrued and unpaid interest, costs, expenses, and other fees owed to the Prepetition ABL Lenders (collectively, the "Prepetition ABL Obligations").  In addition, as of the Petition Date, approximately $10.8 million in letters of credit have been issued in connection with the Prepetition ABL Agreement.  The Prepetition ABL Obligations are secured by first priority liens on, among other things, the Debtors' accounts, chattel paper, inventory, commercial torts, and general intangibles (other than intellectual property) (collectively, the "Revolving Priority Collateral") and second priority liens on all other assets of the Debtors (collectively, the "Term Priority Collateral").

## II.    The Prepetition Term Loan

18.     Each of the Debtors is also indebted under that certain Amended and Restated Credit Agreement dated as of May 22, 3013, which was amended and restated effective February 2, 2018 (as further amended, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Agreement") by and among Charlotte Russe Holdings, Inc., the Borrower, as borrower, the Guarantors, as guarantors, and Jefferies Finance LLC as lead arranger, administrative agent, and collateral agent (the "Prepetition Term Agent," and together with the Prepetition ABL Agent, the "Prepetition Agents") and the lenders party thereto (the "Prepetition Term Lenders," and together with the Prepetition Term Agent, the "Prepetition Term Parties"), pursuant to which, as discussed herein, the Prepetition Term Lenders extended to the Borrowers a term loan in the original principal amount of $150 million (the "Prepetition Term Loan").  The

Prepetition Term Loan accrues interest at a rate of 8.5% and matures on February 2, 2023, unless terminated prior thereto pursuant to the terms of the agreement.

19.     On December 14, 2018, the Required Lenders (as that term is defined in the Term Loan Agreement) executed a waiver of the Prepetition Term Loan's Minimum Liquidity requirement (as defined in the Prepetition Term Loan Agreement) for the quarter ending November 3, 2018.

20.     On December 21, 2018, the Required Lenders executed a second waiver of the Prepetition Term Loan's Minimum Liquidity requirement for the quarter ending February 2, 2019 and each of the Debtors' three fiscal quarters thereafter.

21.     As of the Petition Date, the Debtors owed approximately $89.3 million under the Prepetition Term Loan Agreement, exclusive of accrued and unpaid interest, costs, expenses and other fees owed to the Prepetition Term Lenders (the "Prepetition Term Loan Obligations").  The Prepetition Term Loan Obligations are secured by first priority liens on the Term Priority Collateral and second priority liens on the Revolving Priority Collateral.

22.     The Debtors' prepetition indebtedness is subject to that certain intercreditor agreement dated May 22, 2013 (the "Intercreditor Agreement") between the Prepetition Agents, in such capacities.   The Intercreditor Agreement governs the respective rights, interests, obligations, priority, and positions of the Prepetition ABL Parties and the Prepetition Term Parties.

23.     In the ordinary course of business, the Debtors incur obligations payable to vendors, shippers, utility providers, landlords, and others.  In the months leading up to the Petition Date, certain suppliers and other trade creditors began to pull their ordinary trade terms and, in many instances, require payment upon delivery, placing a significant strain on the Debtors' liquidity.  In order to manage their liquidity as they explored strategic options, the Debtors began to stretch

payments owing to certain vendors, their factoring partners, and landlords.  The Debtors owe their trade vendors, landlords, service providers, and other general unsecured creditors approximately $50 million as of January 31, 2019.

## EVENTS LEADING TO THESE CHAPTER 11 CASES

24.     In 2009, the Debtors were acquired by private equity firm Advent International ("Advent") through a $380 million tender offer (the "Advent Acquisition").  As part of the Advent acquisition, the Debtors issued $175 million principal amount of 12% subordinated debentures (the "Subordinated Debentures") due October 2, 2014, and 85,000,000 shares of Series A Preferred Stock to Advent, certain members of the Debtors' management and certain other investors.

25.     The Subordinated Debentures accrued interest at 12% per annum, which was payable in kind through the issuance of additional principal amounts of Subordinated Debentures. The Series A Preferred Stock accrued dividends at a rate of 8% per annum, which dividends were paid in additional shares of Series A Preferred Stock.  Dividends on the Debtors' Series A Preferred Stock stopped accruing in February 2013.  The Series A Preferred Stock was later converted to common shares (the "Common Stock").

26.     Historically, Charlotte Russe experienced strong growth, with net sales increasing from $776.8 million in fiscal year 2011 to $984.0 million in fiscal year 2014.  Looking to capitalize on this momentum, in 2013 the Company began preparing for an initial public offering (the "IPO").

27.     In May of 2013, the Debtors entered into the Prepetition Term Loan in the principal amount of $150 million and used the proceeds, in part, to repay a portion of the outstanding Subordinated Debentures (which carried a higher interest rate).  The remaining $121.1 million of Subordinated Debentures were converted into Series 1 Preferred Stock that accumulated a fixed

annual dividend at a rate of 8%. The Series 1 Preferred Stock was held by Advent, certain members of the Debtors' management, and certain other investors.

28.    In March of 2014, the Prepetition Term Loan was amended to, among other things, allow for an additional $80 million of borrowing, with the proceeds to be used for the payment of a one-time dividend not to exceed $120 million. In May 2014, the Debtors paid $40 million in dividends to holders of Common Stock, $9.8 million in dividends to holders of Series 1 Preferred Stock, which covered all dividends thus far accrued, and paid $65.7 million towards the Series 1 Preferred Stock principal. The Debtors' intention was to use a portion of the net proceeds of the IPO to repay a substantial amount of the then approximately $230 million of principal due on the Prepetition Term Loan.

29.    Following fifteen (15) consecutive quarters of increased sales, however, the Debtors' performance began to materially deteriorate and plans for the IPO were put on hold. Specifically, gross sales decreased from $984 million in fiscal year 2014 with approximately $93.8 million in adjusted EBITDA, to $928 million in fiscal year 2017 with approximately $41.2 million in adjusted EBITDA. More recently, the Debtors' performance has materially deteriorated, as gross sales decreased from $928 million in fiscal year 2017 with approximately $41.2 million in adjusted EBITDA, to an estimated $795.5 million in fiscal year 2018 with approximately $10.3 million in adjusted EBITDA.

30.    In December of 2016, the Debtors began exploring strategic alternatives with Bank of America/Merrill Lynch ("BAML") as investment banker. The Debtors and BAML contacted numerous strategic partners and met with seven potential financial sponsors. None of the discussions with these parties resulted in the consummation of a transaction, and the Debtors turned their focus to other strategic alternatives.

31.     In June 2017, Moelis & Company ("Moelis") replaced BAML as the Debtors' investment banker.  Moelis and the Debtors thereafter engaged with Advent and certain of the Prepetition Term Lenders on various alternatives to delever the Debtors and position them for operational turnaround, including: (i) amending and extending the Prepetition Term Loan; (ii) obtaining an equity infusion; (iii) continuing to explore a sale to a strategic or financial buyer; and (iv) pursuing a restructuring/recapitalization.  Following substantial diligence and discussions that continued through January 2018, the Debtors, Advent, and, ultimately, all of the Prepetition Term Parties, determined that an out-of-court restructuring was the most viable path forward for the Debtors and their stakeholders.

32.     In December 2017, the Debtors, certain affiliates of Advent, the Prepetition Term Agent, and the Prepetition Term Lenders executed a restructuring support agreement and in February 2018, the Debtors consummated an out-of-court restructuring (the "Out-of-Court Restructuring") which (i) cancelled all existing equity in the Debtors, including Advent's controlling interest, (ii) converted $124 million of the then outstanding $214 million principal amount of the Prepetition Term Loan into 100% of the new equity of the Debtors, (iii) lowered annual interest expense under the Prepetition Term Loan by nearly half, and (iv) extended the maturity of the Prepetition Term Loan by three years, until February 2, 2023.  In connection with the Out-of-Court Restructuring, the Debtors' board of directors stepped down and a new board, comprised of the Debtors' Chief Executive Officer and six appointees selected by certain of the Prepetition Term Lenders, in their capacity as holders of 100% of the equity interests in the Debtors, was installed.  In addition, in consideration of the cancellation of any and all remaining shares held by Advent, Advent and its affiliates were granted broad releases under the restructuring support agreement.

33.     The agreement by the Prepetition Term Parties to equitize nearly 60% of outstanding principal under the Prepetition Term Loan was subject to several challenging conditions, including the Debtors' ability to obtain substantial concessions from landlords and vendors outside of the chapter 11 process and significantly trim operational expenses.   The Debtors, with support from their landlords, were able to meet these threshold conditions and consummated the Out-of-Court Restructuring on February 2, 2018.

34.     Unfortunately, despite this substantial balance sheet and operational deleveraging, the Debtors' performance significantly deteriorated in the third quarter of 2018, during which sales declined by more than $35 million and adjusted EBITDA declined by more than $8 million as compared to the third quarter of 2017.  The Debtors suffered from a dramatic decrease in sales and in-store traffic, and their merchandising and marketing strategies failed to connect with their core demographic and outpace the rapidly evolving fashion trends that are fundamental to their success. The Debtors shifted too far towards fashion basics, did not effectively reposition their e-commerce business and social media engagement strategy for success and growth, and failed to rationalize expenses related to store operations to better balance brick-and-mortar operations with necessary e-commerce investments.

35.     At the same time, the retail industry in general has experienced significant headwinds, requiring traditional brick-and-mortar retailers to adapt to an increasingly digital-focused consumer.  The burden of maintaining a large brick-and-mortar presence, and carrying the substantial associated expenses, has required outsized investment in SG&A that is no longer consistent with the retail apparel industry's shift to a more online-centric platform.  The Debtors' performance suffered in 2018 as a result of these trends.

36.     The Debtors have initiated several strategies to stabilize their business and grow profitability, while regaining relevance with their core consumer.  First, the Debtors intend to shift their focus back to an on-trend, fast-fashion model.  Second, the Debtors will improve customer engagement by developing relevant, real-time content that more frequently engages their core consumer through the online and social media channels that matter most.  Third, the Debtors will stabilize e-commerce through an overhaul of mobile and web platforms to create a seamless user experience with competitive fulfillment in a cost-effective manner.  Fourth, the Debtors will use the chapter 11 process to rationalize their store fleet.  And finally, the Debtors will optimize corporate overhead in connection with their rationalized store fleet.

## THE PROPOSED DIP FINANCING

37.     It is essential that the Debtors obtain immediate access to new financing and post-petition authority to use cash collateral (the "Cash Collateral"), as that term is defined by section 363 of the Bankruptcy Code.  As set forth in the *Declaration of Brian M. Cashman In Support of Debtors' Motion Seeking Entry of Interim and Final Orders (i) Authorizing Debtors To Obtain Postpetition Financing, (ii) Authorizing the Debtors to Use Cash Collateral, (iii) Granting Liens And Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection to the Prepetition Secured Parties, (v) Modifying Automatic Stay, (vi) Scheduling a Final Hearing, and (vii) Granting Related Relief*, filed concurrently herewith, the Debtors made a good faith effort to obtain additional secured or unsecured financing to address their liquidity concerns.  Despite these efforts, the Debtors were unable to find any lender willing to (i) provide financing on a junior basis to the existing secured facilities, or (ii) refinance the existing secured debt in full.  In addition, the Prepetition Secured Lenders declined to consent to the Debtors' granting of a priming lien to a third party lender in connection with a post-petition financing facility.

38.     Accordingly, and in order to allow the Debtors the opportunity to pursue a value maximizing sale, the Debtors negotiated with the Prepetition ABL Agent on the terms of a DIP financing facility and received the consent of the Prepetition Secured Lenders to use Cash Collateral in accordance with a budget that the Debtors believe will be sufficient to pay their administrative expenses that become due and payable before such a sale can be consummated.

39.     The Debtors are facing an immediate liquidity crisis, and without the new financing and the use of Cash Collateral, the Debtors will not have the funds necessary to maintain their assets, pay employees, payroll taxes, inventory suppliers and other vendors, overhead, lease expenses, and other expenses necessary for the operation of the value-maximizing store closing sales outlined in the First Day Declaration.  Accordingly, without immediate access to the new financing or Cash Collateral, the Debtors could suffer substantial and irreparable harm.  The Debtors' need for access to additional liquidity is, therefore, urgent.

## SUMMARY OF THE SALE MOTION

40.     The Debtors retained Guggenheim Securities as their investment banker in December 2018 to explore all possible strategic alternatives.  The Debtors (with the assistance of Guggenheim Securities) began testing the market for potential purchasers of substantially all of the Debtors' assets on a going concern basis.  In so doing, the Debtors (with the assistance of Guggenheim Securities), cast a wide net in soliciting interest from potential purchasers.

41.     Contemporaneously, the Debtors' financial condition continued to deteriorate to the point that they can no longer operate in the ordinary course without immediate access to additional financing.  Unfortunately, the Debtors' assets cannot adequately collateralize additional financing, and in order to sustain further operations (including payment of payroll and inventory

purchases), the Debtors are left with no choice but to immediately seek the Court's approval of the sale of substantially all of their assets through the consummation of one or more transactions.

42.     As of the Petition Date, 17 potential buyers have signed non-disclosure agreements and conducted various degrees of due diligence in consideration of a potential acquisition of a material portion of the Debtors' business operations.  In addition, an electronic data room has been made available for potential bona fide bidders.  Despite some interest, no party has yet submitted a final proposal for a sale transaction.  Nevertheless, the Debtors have negotiated a timeline for the sale of their business that I believe is sufficient, under the circumstances, to continue and finalize a robust marketing and sale process that will maximize value for all stakeholders.

43.     Through the *Debtors' Combined Motion for Entry of an Order (I) Approving Bid and Sale Procedures, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts, and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing, and (V) Approving the Sale* (the "Sale Motion"), filed contemporaneously herewith, the Debtors seek the approval of an expedited sale process that provides the Debtors with an opportunity to obtain a going concern bid.  The Debtors continue to believe that, if available, a going concern sale would provide the best result for all interested parties.

44.     The Sale Motion contemplates that the Debtors will continue to solicit "stalking horse" bids that will set the floor for subsequent bidding on the Debtors' assets.  In the event remaining interest materializes into multiple bids, the Debtors expect to conduct an auction and to request the approval of that transaction or any higher or better bid received at the auction.

45.     In accordance with the Sale Milestones established by the Debtors' proposed DIP Facility, the Debtors are required to obtain a firm commitment form a Going Concern Stalking

Horse Bidder (as defined below) by February 17, 2019. In the event that no such commitment is obtained by that date, the Sale Milestones require the Debtors to pursue a full chain liquidation pursuant to the timeline set forth in the Sale Motion and the Sale Milestones.

46. Failure to meet the Sale Milestones would constitute a default under the DIP Facility and permit the DIP Agent to exercise certain remedies. A default under the DIP Facility would further restrict the Debtors' liquidity and use of Cash Collateral to the substantial detriment of their estates.

47. The Debtors, working with their advisors, including BRG and Guggenheim Securities, have already been engaged in a comprehensive marketing process which contemplates either a Going Concern Transaction or Liquidation Transaction pursuant to section 363 of the Bankruptcy Code with financial and strategic buyers. The proposed Bidding Procedures are designed to permit the Debtors to pursue any available transaction to maximize the value of the Debtors' assets for the benefit of their estates. Further delays through an extended sale timeline will not benefit the estates and the Debtors submit that it is important to move forward with the sale process.

48. The Debtors believe that the proposed timeline appropriately balances the Debtors' desire to conduct a robust marketing process to ensure that they obtain the highest or otherwise best bids for the Assets with the need to consummate a transaction as quickly as practicable, thereby forestalling any potential diminution in the value of the Assets.

## SUMMARY OF FIRST DAY MOTIONS[6]

49.     To minimize the adverse effects of the commencement of these chapter 11 cases, the Debtors have requested a variety of relief in the First Day Motions filed concurrently herewith. I am familiar with the contents of each of the First Day Motions, and to the best of my knowledge, information and belief, the facts set forth therein are true and correct.  I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

50.     Furthermore, I believe that with respect to the First Day Motions requesting the authority, but not direction, to pay discrete prepetition claims or to continue selected prepetition programs, the relief requested is essential to allowing the Debtors to continue to operate as a going concern and that granting the interim relief described herein is necessary to avoid immediate and irreparable harm to the Debtors and their Employees, customers, vendors, creditors, and other stakeholders.  The Debtors have an immediate need to continue the orderly operation of their business by securing goods and paying Employees in the ordinary course of business.  The Debtors' continued operations will enable them to preserve the going concern value of their estates and maintain vendor and customer confidence.  A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

## I.     Emergency Motion Authorizing the Commencement of Store Closing Sales and Assumption of the Store Closing Agreement

51.     The Debtors seek entry of interim and final orders: (i) authorizing the Debtors to commence store-closing or similar-themed sales in certain of the Debtors' retail stores in accordance with the terms of (a) that certain Consulting Agreement, dated as of February 1, 2019 (the "Consulting Agreement"), by and between a joint venture comprised of Gordon Brothers Retail

---

[6]  Capitalized terms used in this section, but not defined, have the meaning ascribed in the respective First Day Motion.

Partners, LLC and Hilco Merchant Resources, LLC (collectively, the "Consultant"), and the

Debtors, and (b) the store-closing sale guidelines (the "Sale Guidelines"), with such sales to be

free and clear of all liens, claims, encumbrances, and interests; (ii) authorizing the Debtors party

to the Agreement to assume the Consulting Agreement following service of the motion and after

a final hearing.

52.    The Debtors determined to commence these chapter 11 cases to maximize the value

of the Debtors' assets for the benefit of their creditors.  As part of this process, the Debtors, with

assistance from BRG, conducted an analysis of the performance, sales, and profitability of all of

the Debtors' retail stores.  Ultimately, the Debtors determined that commencing the Store Closing

Sales was the best way under the circumstances to maximize the value of the Debtors' business

and assets for their estates and creditors.

53.    Accordingly, in January 2019, the Debtors, BRG, and Guggenheim Securities

contacted certain nationally recognized liquidators to solicit interest in bidding on the right to

conduct the Store Closing Sales.  Ultimately, the Debtors, with assistance from BRG, selected the

Consultant to conduct the Store Closing Sales and determined to liquidate the merchandise (the

"Merchandise") and certain furnishings, trade fixtures, equipment, and improvements to real

property at the respective Closing Stores (collectively, the "Offered FF&E"), and, where the

owners consent, the Debtors' "Non-Merchandise" (as defined in the Consulting Agreement, and

together with the Merchandise and Offered FF&E, the "Store Closure Assets") in accordance with

the terms of the Consulting Agreement (the material terms of which are set forth below) and the

Sale Guidelines.

### A.    The Consulting Agreement

54.    Under the terms of the Consulting Agreement, the Consultant will serve as the

exclusive consultant to the Debtors for the purpose of conducting a sale of the Store Closure Assets

at the Closing Stores using the procedures outlined in the Sale Guidelines.  Through the Proposed

Final Order, the Debtors party to the Consulting Agreement seek to assume the Consulting

Agreement so that they may leverage the experience and resources of the Consultant in performing

large-scale liquidations while retaining control over the sale process, which the Debtors believe

will provide the maximum value to their estates and creditors.

55.    The material terms of the Consulting Agreement are described in the summary chart

below.[7]

| Provision | Description |
|---|---|
| Store Closing Sales Term | The Store Closing Sales will commence no later than February 7, 2019 and will terminate on March 31, 2019 (the "Sale Termination Date").  Merchant and the Consultant may mutually agree to terminate or extend the Sale Termination Date at any store. |
| Closing Stores | The Closing Stores include 94 stores listed on Exhibit A to the Consulting Agreement. |
| Services Provided by Consultant | The Consultant will be retained as the Merchant's exclusive consultant for the purpose of conducting the Store Closing Sales during the Sale Term, to, among other things: (i) recommend appropriate discounting to effectively sell the Merchandise in accordance with a "store closing" or other mutually agreeable theme, and recommend appropriate point-of-purchase, point-of-sale, and other internal and external advertising in connection therewith, (ii) provide qualified supervision with respect to the Closing Stores to oversee the conduct of the Sale and to oversee the Sale process in the Closing Stores; (iii) maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by the Debtors' employees to customers and others about the Sale; (iv) establish and monitor accounting functions for the Sale, including evaluation of sales of Merchandise by category, sales reporting and expense monitoring; (v) coordinate with the Debtors so that the operation of the Closing Stores is being properly maintained including ongoing customer service and housekeeping activities; and (vi) recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs for store employees. |
| Merchant's Undertakings | Merchant will (a) have control over the personnel in the Closing Stores and shall handle the cash, debit and charge card payments for all Merchandise sold during the Sale Term in accordance with Merchant's normal cash management procedures, subject to Consultant's right to audit any such items; (b) be solely responsible for the computing, |

---

[7]  Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the Consulting Agreement. To the extent that this summary differs in any way from the terms set forth in the Consulting Agreement, the terms of the Consulting Agreement shall control.

| | |
|---|---|
| | collecting, holding, reporting, and paying all sales taxes associated with the sale of Merchandise during the Sale Term, and Consultant shall have absolutely no responsibilities or liabilities therefor; (c) comply with all federal, state, and local laws applicable (respectively) to them in connection with the Sale; and (d) acknowledge that the parties are not conducting an inventory of the Merchandise and that Consultant has made no independent assessment of the beginning levels of Merchandise, and Consultant shall not bear any liability for shrink or other loss to the Merchandise. |
| Consultant's Fee and Expenses | In consideration of its services hereunder, Consultant shall earn a Base Fee equal to 0.75% of Gross Proceeds.  In addition to the Base Fee, Consultant may also earn an Incentive Fee equal to the aggregate sum of the percentages shown in the following table, based upon the following thresholds of Gross Recovery Percentage: |

| Gross Recovery Percentage | Incentive Fee |
|---|---|
| Below 135.00% | No Incentive Fee |
| Between 135.00% to 145.00% | Additional 0.25% of Gross Proceeds |
| Above 145.00% | Additional 0.25% of Gross Proceeds |

| | |
|---|---|
| | Notwithstanding the foregoing, if, according to the above table, the Merchandise Fee increases as a result of the Gross Recovery equaling or exceeding a threshold, and (x) the Gross Proceeds, net of such applicable increased Merchandise Fee, are less than (y) the Gross Proceeds, net of the immediately preceding Merchandise Fee according to the table, the Merchandise Fee shall not be increased until such time as the Gross Proceeds calculation in (x) is equal to or greater than the Gross Proceeds calculation in (y). For the avoidance of doubt, it is the intention of the parties that Gross Proceeds to the Merchant net of the Merchandise Fee not decrease to the extent Gross Proceeds increase above a Gross Recovery threshold.

Consultant will also earn a commission of 15% on the sale of any Offered FF&E and a fee of equal to the definitive Merchandise Fee percentage earned on sales of merchandise multiplied by the aggregate gross proceeds, net only of sales taxes, from the sale of Non-Merchandise at the Stores.

Merchant will pay for all expenses incident to the conduct of the Sale and the operation of the Stores during the Sale Term, except solely for any specifically enumerated Consultant Controlled Expenses that exceed the aggregate budgeted amount for such Consultant Controlled Expenses. |
| Additional Consultant Goods | Consultant shall have the right, at its sole cost and expense, to supplement the Merchandise in the Sales with additional goods procured by Consultant which are of like kind and no lesser quality to the Merchandise in the Sale.

Sales of Additional Consultant Goods shall be run through Merchant's cash register systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other |

| | |
|---|---|
| | manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and Merchant shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Merchant goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale.<br><br>Consultant shall pay to Merchant an amount equal to 7.5% of the gross proceeds (excluding sales taxes) from the sale of Additional Consultant Goods.<br>The Additional Consultant Goods shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code. Consultant shall be granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds less the Additional Consultant Goods Fee, and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties. |
| Insurance; Risk of Loss | During the Sale Term: (a) Merchant shall maintain (at its expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, and (b) each of Merchant and Consultant shall maintain (at each party's respective expense) comprehensive liability insurance covering injuries to persons and property in or in connection with the Closing Stores, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury and/or property damage. Each party shall be added as an additional insured on all such insurance of the other party, all such insurance shall be non-cancelable and non-changeable except upon 30 days' prior written notice to the other party, and each party shall provide the other with certificates of all such insurance prior to the commencement of the Sale.<br><br>Notwithstanding any other provision of the Consultant Agreement, Merchant and Consultant agree that (i) Consultant shall not be deemed to be in possession or control of the Stores, or the Merchandise, Non-Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) Consultant does not assume any of Merchant's obligations or liabilities with respect to any of the matters addressed in subsection (i) above.<br><br>Notwithstanding any other provision of the Consultant Agreement, Merchant and Consultant agree that Merchant shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores, and Merchandise and Non-Merchandise sold in the Stores, before, during and after the Sale Term. |
| Indemnification by Consultant | Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Merchant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, |

|  | reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: |
|---|---|
|  | (i) Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in the Consultant Agreement or in any written agreement entered into in connection therewith; |
|  | (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives; or |
|  | (iii) the negligence, willful misconduct or unlawful acts of the Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives. |
| Indemnification by Merchant | Merchant shall indemnify and hold the Consultant, its affiliates and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: |
|  | (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in the Consultant Agreement or in any written agreement entered into in connection therewith; |
|  | (ii) any claims by any party engaged by Merchant as an employee or independent contractor arising out of such engagement; |
|  | (iii) any consumer warranty or products liability claims relating to any Merchandise and Non-Merchandise Goods; and/or |
|  | (iv) the negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives. |

## II.     Additional First Day Motions

### A.     Motion to Direct Joint Administration of the Debtors' Chapter 11 Cases

56.     The Debtors have filed several purely administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' bankruptcy cases.  As in many large chapter 11 cases that are jointly administered, the Debtors do not maintain lists of the names and

addresses of their respective creditors on a debtor-by-debtor basis.  Given the integrated nature of

the Debtors' operations, joint administration of these chapter 11 cases will provide significant

administrative convenience without harming the substantive rights of any party in interest.

**B.      Motion Seeking Authority to File a Consolidated List of Creditors**

57.      The Debtors also seek authorization to file a consolidated creditor matrix and list

of the thirty (30) largest general unsecured creditors  in  lieu  of  submitting  separate  mailing

matrices  and  creditor lists for each Debtor.

58.      The preparation of separate lists of creditors for each Debtor would be expensive

and time consuming and, therefore, the Debtors request to file a consolidated creditor matrix.

Moreover,  filing  a  top  thirty  (30)  will  help  alleviate  administrative  burdens,  costs,  and  the

possibility of duplicative mailings of required notices to parties in interest

**C.      Applications to Approve the Appointment and Retention of Donlin, Recano,
         & Company, Inc. as the Claims and Noticing Agent and Administrative
         Agent to the Debtors, Effective *Nunc Pro Tunc* to the Petition Date**

59.      The Debtors have also requested the approval of a services agreement between the

Debtors and Donlin, Recano, and Company, Inc. ("<u>DRC</u>"),[8] and the Debtors' retention and

employment of DRC as claims and noticing agent and administrative advisor for the Debtors in

lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware, effective *nunc*

*pro tunc* to the Petition Date.  The Debtors anticipate that there will be in excess of 10,000 entities

that will require notice, and many of which are expected to file proofs of claim in the Debtors'

chapter 11 cases.  In view of the number of anticipated claimants, parties requiring notice, and the

complexity of the Debtors' business, the Debtors submit that the appointment of a claims and

---

[8]  The DRC applications are supported by separate declarations of Nellwyn Voorhies of DRC.

noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

**D.      Motion to Authorize the Debtors Continued Use of Their Cash Management System, Maintain Existing Business Forms, and Authorize the Debtors to Continue Intercompany Transactions**

60.      The Debtors seek entry of interim and final orders authorizing the Debtors to: (i) continue to operate their cash management system (the "Cash Management System"); (ii) maintain existing business forms; and (iii) continue intercompany transactions in the ordinary course.

61.      The Debtors maintain a complex cash management system that is typical of a multi-store retail operation and comparable to the centralized cash management systems used by other similarly sized retail companies to manage the cash flow of operating units in a cost-effective, efficient manner.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds to various operating accounts and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' accounting department maintains daily oversight over the Cash Management System and implements cash management control protocols for entering, processing, and releasing funds, including in connection with intercompany transactions.  Additionally, the Debtors' accounting department reconciles, on a daily basis, the Debtors' books and records to ensure that all transfers are accounted for properly.

62.      Because of the nature of the Debtors' business and the disruption to the business that would result if the Debtors were forced to close their existing bank accounts, it is critical that the existing Cash Management System remain in place.

63.      The Cash Management System is comprised of approximately thirteen (13) bank accounts (the "Bank Accounts"), the majority of which are located with the Prepetition ABL

Agent.  The Cash Management System is based on a centralized concentration account (the "Concentration Account") and a centralized operating account (the "Operating Account"), both with the Prepetition ABL Agent.  All of the Bank Accounts are maintained by Debtor Charlotte Russe, Inc.  The Cash Management System is organized to facilitate the seamless collection and disbursement of cash under the Debtors' Prepetition ABL Loan.

64.     Prior to the Petition Date, the Prepetition ABL Lenders instituted cash dominion over their Cash Collateral.  As a result, each day, all available funds in the Concentration Account are used to pay down obligations under the Prepetition ABL Loan.   In connection with the effectuation of cash dominion, each day the Debtors draw down on the Prepetition ABL Loan (by means of a borrowing request to the Prepetition ABL Agent) to meet their daily operating obligations.  The money drawn from the Prepetition ABL Loan flows into the Operating Account and is subsequently disbursed through the Cash Management System.

### 1.     Collection Process

65.     Cash collections from brick-and-mortar sales, including Peek locations, are transferred by an armored car service from each store and deposited directly into depository accounts for the Debtors (collectively, the "Store Depository Accounts") maintained by a variety of banks.

66.     All of the Store Depository Accounts are linked directly to a concentration account (the "Concentration Account") held by Charlotte Russe, Inc. and maintained by the Prepetition ABL Agent.   As of the Petition Date, these Store Depository Accounts are swept to the Concentration Account daily, subject to certain account specific minimum operating balances.

67.     Proceeds from both brick-and-mortar and e-commerce credit card sales, including ATM/debit cards with a Visa or MasterCard logo, Paypal, Afterpay, Amazon Pay, and Android

Pay are deposited by the third-party processors of those credit card or check transactions, net of certain customer returns, chargebacks and fees, are deposited into another Prepetition ABL Agent account (the "Credit Card Account") each business day following a two day processing period (*e.g.* funds for purchases made on Monday are customarily deposited Wednesday).[9]  As of the Petition Date, the Credit Card Account is automatically swept to the Concentration Account daily.

68.    The Debtors are required to submit a sweep request to the banks to transfer funds from the Store Depository Accounts to the Concentration Account.  Pre-cash dominion, the Concentration Account for Charlotte Russe, Inc. was then automatically swept daily to an operating account (the "Operating Account") such that a minimum balance of $25,000 remained in the Concentration Account at all times.  As of the Petition Date, any balance over the minimum required balance of $25,000 is used to pay down the balance owed on the Prepetition ABL Loan.

69.    Pre-cash dominion, the Concentration Account was linked directly to the Operating Account, which is also maintained by the Prepetition ABL Agent.  Funds in excess of the $25,000 minimum required balance which were on deposit in the Concentration Account were automatically swept to the Operating Account, which in turn would be used to fund the Disbursement Accounts (as defined below).  Any funds remaining in the Operating Account following funding of the Disbursement Accounts were then used to pay down the Prepetition ABL Loan on a daily basis.  Conversely, funds were borrowed from the Prepetition ABL Loan in an amount sufficient to cover disbursements from the Operating Account as needed.

70.    As of the Petition Date, the Debtors draw down on the Prepetition ABL Loan (by means of a daily borrowing request to the Prepetition ABL Agent) to meet their daily operating

---

[9] Although the customary processing period is two business days, it may extend to five business days in some instances.

obligations.  The money drawn from the Prepetition ABL Loan flows into the Operating Account and is subsequently disbursed through the Cash Management System.

### 2.    Disbursements Process

71.    Charlotte Russe, Inc. maintains disbursement accounts (the "<u>Disbursement Accounts</u>") that are linked to and funded through the Operating Account.  The Disbursement Accounts are zero balance accounts.  Funds are automatically transferred from the Operating Account, on each business day, in an amount sufficient to cover checks issued by the Debtors' from the Disbursement Accounts which have been presented for payment.

### 3.    The Debtors' Existing Business Forms and Check Stock

72.    In the ordinary course of business, the Debtors use a variety of checks and business forms.  To minimize expenses to their estates and avoid unnecessary confusion to their employees, customers, and suppliers, the Debtors submit it is appropriate to continue to use all checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "<u>Business Forms</u>") as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

73.    With respect to checks, the Debtors generally print their own checks from existing check stock and as debtors in possession will print checks with a new post-petition sequence

number and reference to the Debtors' status as debtors in possession and bankruptcy case number as soon as it is reasonably practical to do so.[10]

### 4.     Intercompany Transactions

74.     In the ordinary course of business, the Debtors engage in routine business transactions with each other (the "Intercompany Transactions") resulting in receivables and payables (the "Intercompany Claims").  Accordingly, at any given time there may be Intercompany Claims owed by one Debtor to another Debtor.  For example, in the normal course of business, the Debtors purchase merchandise through the account maintained by Debtor Charlotte Russe Merchandising, Inc. (the "Merchandise Purchasing Account").  The funds used to purchase the merchandise are disbursed from a Disbursement Account maintained by Debtor Charlotte Russe, Inc. to the Merchandise Purchasing Account.

75.     In addition, certain of the Debtors' funds may become intermingled as a result of their Cash Management System, as described above.  These funds are reconciled through Intercompany Transactions.

76.     The Debtors are required to maintain separate bank accounts for each of Charlotte Russe Merchandising, Inc. and Charlotte Russe Administration, Inc. pursuant to the corporate by-laws for these entities, and are further required to maintain a minimum balance of $1,000 in each of these accounts at all times.  In the extremely rare instance that one of these entities must actually disburse funds, the disbursement is made by Charlotte Russe, Inc. and an intercompany loan is recorded to offset the disbursement.

---

[10]  The Debtors' payroll checks are cut by ADP, LLC ("ADP"), which utilizes its own check stock.  The Debtors' will seek to have ADP print payroll checks with a new post-petition sequence number and a reference to the Debtors' status as debtors in possession and bankruptcy case number.

77.     The Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.  The Debtors track all transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors will continue to track Intercompany Transactions on a post-petition basis.  Disallowing the continued use of Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors and their creditors and other stakeholders.

### E.     Motion Authorizing the Debtors to Pay Certain Prepetition Shipping, Delivery, and Warehousemen Charges

78.     The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay certain prepetition claims for shipping, freight forwarding, consolidating, and warehousemen (collectively, the "Transporter Claims") and (ii) authorizing the Banks to receive, process, honor, and pay all checks and electronic funds transfers related thereto.

79.     The Debtors' business depends on the daily process of importing and shipping their products to stock the Debtors' stores.  In order to ensure the steady movement of products, the Debtors rely on a network of shippers, freight forwarders, and consolidators (the "Shippers"), who process and ship the Debtors' merchandise (the "Merchandise") to and from the Debtors' distribution center and stores.  If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation of the Merchandise, various statutes, tariffs, and agreements may permit the shippers, freight forwarders, and consolidators to assert possessory liens against any Merchandise in their possession.

80.     In addition, some of the Debtors' Merchandise is delivered by the Shippers to warehouses operated by third parties (the "Warehousemen") who receive and store the Merchandise in their warehouses prior to ultimate delivery to the stores.  In the event that the

Debtors fail to reimburse the Warehousemen for charges incurred in connection with the storage of the Merchandise, various state laws permit the Warehousemen to assert a statutory lien against the Merchandise in their possession that is the subject of any delinquent charges, securing such charges and potentially blocking the Debtors' access to the stored Merchandise.

81.     As of the Petition Date, the Debtors estimate that approximately $5.5 million is owed in the aggregate on account of prepetition Transporter Claims.  These amounts are in respect of shippers, freight forwarders, consolidators, and warehousemen, and include both amounts the Debtors have been invoiced for, as well as amounts that the Debtors have not yet been invoiced for but are believed to have been incurred as of the Petition Date based on historical practice. Payment of the foregoing Transporter Claims will avoid disruption in the Debtors' business, prevent the possibility of possessory liens being asserted against the Merchandise, and enable the Debtors to realize the value of the Merchandise and continue their operations uninterrupted.

82.     Moreover, although the Debtors believe that the above aggregate amount of unpaid prepetition Transporter Claims is accurate, to the extent that additional amounts are found to be outstanding (most likely due to delayed invoicing or the timing of certain shipments), the Debtors must be able to pay such amounts in order to gain access to the Merchandise, as any disruption in the Debtors' movement of Merchandise could result in significant adverse consequences to the Debtors' business.

83.     As such, the Debtors request authority, but not direction, to pay prepetition Transporter Claims as and when the Debtors determine that payment is necessary or appropriate in an amount not to exceed $3.5 million on an interim basis and $5.5 million on a final basis.  The Debtors propose to condition the payment of prepetition Transporter Claims on the agreement of individual shippers, freight forwarders, consolidators, and warehousemen to continue to provide

services to the Debtors during the pendency of these Cases on the most favorable terms that existed prior to the Petition Date (the "Historical Trade Terms"), unless this requirement is waived by the Debtors. If any party accepts payment from the Debtors on account of its Transporter Claim and thereafter does not continue to provide services to the Debtors on the Historical Trade Terms, then the Debtors hereby seek authority, in their discretion and without further order of the Court, to take any and all appropriate steps to cause such party to repay payments made to it on account of its Transporter Claim to the extent that such payments exceed the post-petition amounts then owing to such party.

84.       The Debtors also request that the Banks be authorized to receive, process, honor, and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors related to the prepetition obligations described above, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtors further request that all Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to entry of this Court's order.

**F.       Motion Approving the Debtors Proposed Adequate Assurance and Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service**

85.       The Debtors seek entry of interim and final orders (i) approving the Proposed Adequate Assurance of payment for future utility services, (ii) prohibiting Utility Companies (as defined below) from altering, refusing, or discontinuing services, (iii) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests, and (iv) authorizing fee payments to utilities consultants for services performed.

86.       In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, telephone, internet, water, waste disposal,

and other similar services (collectively, the "Utility Services") from several utility companies or brokers (collectively, the "Utility Companies").

87.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Cases.  The Debtors' operations require electricity and gas for lighting, heating, and air conditioning.  In addition to operating over 500 retail stores, the Debtors maintain corporate offices and a distribution center responsible for ensuring the smooth operations of the Debtors' business.  Should any provider of Utility Services refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted.  Accordingly, it is essential that the Utility Services continue uninterrupted during these Cases.

88.     On average, the Debtors pay approximately $1 million each month for third party Utility Services in connection with their stores, corporate offices, and distribution center.

89.     The Debtors intend to pay post-petition obligations owed to the Utility Companies in a timely manner from (i) cash held by the Debtors, (ii) cash generated in the ordinary course of the Debtors' business, and/or (iii) cash available to the Debtors through debtor in possession financing.  The Debtors submit that these sources will provide sufficient liquidity to pay the Debtors' Utility Service obligations during the pendency of these Cases.

90.     To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $500,000 (the "Adequate Assurance Deposit"), which represents an amount equal to approximately two weeks of the Debtors' average cost of Utility Services, calculated based on the Debtors' average third party utility expenses over the five months ended December 31, 2018.  The Adequate Assurance Deposit will be deposited into a segregated account no later than twenty business days after entry of the Interim Order and held during the pendency of these cases.

### G. Motion Authorizing the Debtors to Maintain, Administer, and Continue Certain Customer Programs

91.     The Debtors seek entry of an order authorizing the Debtors, at their sole discretion, to maintain and administer their customer-related programs (collectively, the "Customer Programs") as described herein.

92.     The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and generate goodwill for the Debtors' business and brand.  Maintaining the goodwill of their customers is important to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.  As set forth below, the Debtors maintain the following Customer Programs.

### 1. Refund and Exchange Programs

93.     Under the refund and exchange programs (the "Refund and Exchange Programs") the Debtors' customers can return, exchange, or receive credit for merchandise that is returned in its original condition within 30 days of purchase.  If merchandise is returned with the receipt/packing slip, the merchandise is refunded for the full purchase amount in the form of the original purchase method of payment.  For merchandise returned without a receipt/packing slip but within thirty (30) days, a merchandise credit card (the "Charlotte Russe Merchandise Credit Card") is issued, or alternatively, the merchandise can be exchanged for other merchandise at the current selling price.

94.     Programs like the Refund and Exchange Programs are common in the retail industry and similar programs are used by the Debtors' competitors.  Thus, the Debtors' customers have a ready selection of alternative retailers willing to meet customers' needs and take their

business away from the Debtors.  As such, the Refund and Exchange Programs are critical to maintaining the goodwill of the Debtors' customer base and the Debtors' competitiveness within their industry.  Subject to court approval of the Store Closing Motion on an interim basis, the Refund and Exchange Programs will be subject in all respects to the terms of the Consulting Agreement.

**2.    The Gift Card Program**

95.    The Debtors maintain two gift card programs pursuant to which customers may purchase (i) Charlotte Russe Gift Cards (the "Charlotte Russe Gift Cards") or (ii) Peek Gift Cards (the "Peek Gift Cards" and together with the Charlotte Russe Gift Cards, the "Gift Cards" or the "Gift Card Program"), made available to Debtors' customers in the ordinary course of business and in any denomination of US Dollars.  Prior to the Petition Date, customers could purchase Charlotte Russe Gift Cards in the Debtors' Charlotte Russe retail stores and Peek Gift Cards in the Debtors' Peek retail stores.  Customers could also purchase Charlotte Russe Gift Cards through their online store.[11]

96.    Charlotte Russe Gift Cards could be redeemed towards in-store purchases or on the Debtors' Charlotte Russe E-Commerce Website, whereas Peek Gift Cards could only be used for in-store purchases.  The Gift Cards do not have expiration dates.  Gift card programs of this nature are commonplace and popular in the retail industry, and the Debtors' competitors offer similar programs to their customers.

---

[11]  The Debtors operate separate e-commerce websites for Charlotte Russe (www.charlotterusse.com) (the "Charlotte Russe E-Commerce Website") and Peek Kids (www.peekkids.com) (the "Peek Kids E-Commerce Website" and with the Charlotte Russe E-Commerce Website, the "Charlotte Russe E-Commerce Website").

97.    The Debtors pay Stored Value Solutions ("SVS") approximately $5,000 to $8,000 per month to process and administer the Charlotte Russe Gift Card Program.[12]  Worldpay, Inc. ("Worldpay") processes and administers the Peek Gift Card Program as an ancillary service.  The Debtors estimate that as of the Petition Date they owe approximately $5,000 to $8,000 to SVS on account of the administration fees associated with the Charlotte Russe Gift Card Program.

98.    The Debtors estimate that of the Petition Date, approximately $3,640,906[13] in issued Gift Cards are outstanding.[14]  The Debtors stopped issuing Gift Cards on January 22, 2019.

### 3.    Promotional Programs

99.    In the ordinary course of business, the Debtors have established certain promotional programs designed to generate revenues across their enterprise (collectively, the "Promotional Programs").  The Promotional Programs consist of seasonal and item specific sales and coupons that can be used to purchase merchandise at the Debtors' retail stores or online on the Debtors' website.  Advertisements for the Promotional Programs are distributed in stores and through e-mail.

100.    The Debtors are currently running one promotional program, a shopping card program (the "Shopping Card Program").  Qualifying Charlotte Russe customers have until February 13, 2019 to redeem the $10 cards provided to them under the Shopping Card Program in late 2018.

---

[12]  The Debtors' payments to SVS include processing and administrative fees related the Charlotte Russe Merchandise Credit Card Program.

[13]  The gross amount of Gift Cards outstanding is $16,814,489.  However, the amount that is actually reflected on the Debtors' books and records is $3,640,906 as a result of annual breakage which reflects the value of all Gift Cards issued over thirteen (13) months and the estimate of the percentage of Gift Cards that were issued within the thirteen (13) months prior that will most likely not be redeemed within thirteen (13) months.  The Debtors do not maintain information regarding the individual holders of unredeemed Gift Cards.

[14]  This amount includes outstanding Charlotte Russe Merchandise Credit Card balances.

101.    The Promotional Programs, including the Shopping Card Program, are an important part of the Debtors' marketing strategy, as they engender goodwill for the brand, target captive customers or customers that would otherwise be unlikely to purchase the Debtors' merchandise, help the Debtors to liquidate merchandise that is near the end of its seasonal life, and generate revenue by encouraging sales at the Debtors' store locations.  The Debtors' estimate that as of the Petition Date, approximately $306,506 is outstanding under the Shopping Card Program.[15]

### 4.    Credit Card and Other Payment Processors

102.    In addition to cash, Gift Cards, and Charlotte Russe Merchandise Credit Cards, the Debtors accept the following methods of payment from customers: (a) Visa, MasterCard, Discover, and American Express credit cards; (b) PayPal; (c) Afterpay; (d) Amazon Pay; (e) Apple Pay; (f) Android Pay; and (g) ATM/Debit Cards with a Visa or MasterCard logo (the "Non-Cash Payments").  To process Non-Cash Payments, the Debtors are party to certain agreements (the "Payment Processing Agreements")[16] with certain payment processors (the "Payment Processing Companies").  Pursuant to the Payment Processing Agreements, the Debtors generally receive payments equal to gross customer sales less any standard chargebacks, returns, and interchange fees[17] charged.  Generally, the interchange fees are set off from the funds that are remitted to the Debtors on account of the Non-Cash Payments on a daily basis.  However, for ATM/Debit Cards with a Visa or MasterCard logo, the Debtors pay processing fees (the "Processing Fees") on a monthly basis to Worldpay.  The Debtors also pay a monthly Processing Fee to Cybersource in connection with Non-Cash Payments related to purchases made through the Peek Kids E-

---

[15] The Debtors do not maintain information regarding the individual holders of unredeemed Shopping Cards.

[16] AfterPay, AmazonPay, and PayPal are not subject to any Payment Processing Agreements.

[17]  Interchange fees are transaction fees a merchant's bank pays to cardholder's bank when customers use a credit or debit card to make a purchase.  *See* https://www.mastercard.us/en-us/about-mastercard/what-we-do/interchange.html.

Commerce Website. The standard interchange and processing rates charged by each Payment Processing Company vary, but are in the range of 1.0% to 4.6% per sale transaction.

103.     When customers either return merchandise to the Debtors following a purchase made by Non-Cash Payment or dispute charges with a Payment Processing Company, the Debtors may be obligated to refund the purchase price of returned or disputed merchandise to the Payment Processing Company, subject to certain adjustments (collectively, "Chargebacks," and together with the Processing Fees and interchange rates, the "Processing Obligations"). Generally, Chargebacks are satisfied by netting the amount charged against pending payments owed by a Payment Processing Company to the Debtors.  Due to the automated nature of the Processing Obligations, it is possible that certain Processing Obligations incurred by the Debtors immediately prior to the Petition Date may not have been fully set off against the payments received by the Debtors prior to the Petition Date.

104.     The Debtors' continued acceptance of Non-Cash Payments is essential to the operation of the Debtors' business because the majority of the Debtors' sales are made using Non-Cash Payments.  Declining to accept Non-Cash Payments would have a severe negative effect on the Debtors' ongoing operations, the cost of which would be incurred by their estates and, by extension, their creditors and all parties in interest.  On average, the Debtors pay Worldpay approximately $51,000 per month in Processing Fees and approximately $385,000 per month in debit interchange fees and other pass through fees.[18]  As of the Petition Date, the Debtors estimate that they owe approximately $51,000 to Worldpay on account of Processing Fees, all of which will come due post-petition.

---

[18] Unlike credit interchange fees, debit interchange fees are not netted on a daily basis.

**H.      Motion Authorizing Payment of Wages, Compensation, and Employee Benefits**

105.      The Debtors seek entry of interim and final orders authorizing, but not requiring, the Debtors to (i) pay to the Debtors' employees, up to $7.62 million, which is comprised of (a) Wage Obligations in the amount of approximately $5.0 million; (b) Expense Reimbursements in the amount of $114,000; and (c) up to $2.5 million on account of the Debtors' PTO Plans, of which approximately $750,000 is sought on an interim basis with the remainder authorized to be paid out on a final basis; and (ii) pay third party vendors/administrators in connection with the Employee Benefits in the amount of approximately $983,000 in the interim period and up to $1.03 million monthly on a final basis.

**1.      The Debtors' Employee Obligations**

106.      In the ordinary course of business, the Debtors incur payroll and employee benefits obligations to their employees for the performance of services.  As of the Petition Date, the Debtors employ approximately 8,744 individuals (the "Employees"), approximately 1,412 of whom are full-time and none of whom are members of a union.

107.      The Debtors incurred outstanding Employee Obligations and Employee Benefits relating to the period prior to the Petition Date.  Certain of these costs and obligations are outstanding, due and payable now, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date, most of which will become due and owing before final relief can be granted.

108.      The Debtors do not seek authority to pay any prepetition amounts in excess of $12,850 per Employee.

### a)    Wages and Salaries

109.    Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages, commissions, and salaries for their Employees every two weeks in arrears (the "Wage Obligations").  The Debtors' last payroll payment was made on January 25, 2019.  The Debtors' currently estimated payroll during the pay-period ending February 2, 2019, including estimated employer payroll tax obligations, is approximately $5 million and is scheduled to be paid on or about February 8, 2019.

110.    All Wage Obligations accrued before the Petition Date compensate Employees for work already performed.  As a result, accrued outstanding Wage Obligations for the prepetition period for the Debtors aggregate approximately $5 million, which is inclusive of estimated employer payroll tax obligations.

### b)    Payroll Processing Fees

111.    Certain Withholding Obligations for the Debtors' Employees are processed and administered by ADP, LLC.  The Debtors pay approximately $15,000 per pay period for such services.  As of the Petition Date, the Debtors estimate they owe $215,000[19] on account of prepetition payroll services, all of which will come due within the first 30 days of these chapter 11 cases.

### c)    Payroll Taxes

112.    The Debtors are required by law to withhold from the Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  In addition, the Debtors are required to make matching

---

[19] Of this, $200,000 reflects an annual fee associated with the processing of employee W-2s.

payments from their own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").

### d)   Expense Reimbursements

113.    The Debtors' Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses.  Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' business, the Employees are reimbursed in full (the "Expense Reimbursements") after submission of appropriate expense reimbursement reports to the Employee's manager and the accounting department.  Expense reports must be submitted by the Employee according to the expense report schedule, and must include, *inter alia*: (i) the amount of the expense; (ii) the time and place of travel; (iii) the business purpose for the expense; and (iv) the identity and business relationship of others who participated in the event.  In addition, prior to the Petition Date the Debtors issued company credit cards that Employees could use to pay for business related expenses.  The balances on the credit cards are paid directly by the Employees, who are then reimbursed by the Debtors, and Employee-cardholders may be held personally liable for unpaid credit card balances.  The Debtors believe it is necessary to allow payment of unpaid credit card expenses incurred during the period prior to the Petition Date as part of the Expense Reimbursements to limit any potential liability Employee cardholders may have.

114.    In the six-month period prior to the Petition Date, Expense Reimbursements averaged approximately $190,000 per month.  The Debtors estimate that there are Expense Reimbursements currently outstanding in the approximate amount of $114,000.  However,

Employees may have incurred expenses before the Petition Date that have not yet submitted requests for reimbursement that may increase this amount.

### 2. The Debtors' Employee Benefits[20]

115. In the ordinary course of business, the Debtors established various Employee Benefits for their eligible Employees that can be divided into the following categories: (i) paid time-off plans, including vacation days (the "PTO Plans"), (ii) insurance, including medical, vision, dental, life, and short-term and long-term disability insurance (collectively, the "Health and Welfare Plans"), (iii) Flexible Savings Accounts (as defined below); (iv) 401(k) Plans (as defined below); and (v) an assistance program in connection with Employee well-being (the "Assistance Program"). The Debtors directly deduct specified amounts from Employees' wages in connection with certain of the Employee Benefits.

### a) Paid Time-Off Benefits

116. Under the PTO Plans, eligible Employees may receive their full wages for days not worked ("PTO"). PTO may be used for any reason, including vacation, sickness, medical appointments, or other personal reasons. All full-time salaried and hourly employees are eligible to accrue up to five weeks of PTO a year depending on the Employee's position and length of employment. Except as provided by applicable law,[21] an Employee's accrued PTO cannot exceed the Employee's annual accrual amount.

---

[20] In addition to the Employee Benefits detailed herein, the Debtors have heretofore offered bonus incentives to certain non-insiders based on pre-determined monthly or quarterly goals related to, among other things, sales, accuracy, and safety. The Debtors are not seeking authority to continue these programs as of the Petition Date. The Debtors are not seeking authority to continue these programs as of the Petition Date. The estimated aggregate of such accrued but unpaid bonuses for January is $80,000.

[21] Certain state and local authorities where the Debtors operate may impose additional requirements on the accrual of PTO in lieu of vacation and/or sick days. The Debtors seek authority to continue to comply with such state and local requirements in accordance with applicable law.

117.     In addition, the Debtors provide certain other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, and (c) other paid and unpaid leaves of absence for personal reasons, including for bereavement leave and those required by law.  Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

118.     In addition to Employees using PTO in the ordinary course of business, prior to the Petition Date, eligible Employees could convert unused and accrued PTO (the "PTO Conversion") to an immediate cash payout due to financial hardship.[22]   The PTO Conversion program was terminated as of the Petition Date.  Moreover, Employees may receive an immediate cash payout of accrued and unused PTO upon voluntary resignation of an Employee after proper notice is given or upon termination of an Employee without cause (the "Termination Payout").  The Debtors' current, eligible Employees have accrued approximately $2.5 million in unused time in connection with the PTO Plans as of the Petition Date.  Eligible Employees stopped accruing benefits under the PTO Plans as of the Petition Date.[23]

### b)     Health and Welfare Plans

119.     The Debtors sponsor several Health and Welfare Plans to provide benefits to eligible Employees, including, without limitation, (i) medical, dental, or other health-related plans, (ii) life insurance, (iii) short-term and long-term disability insurance, and (iv) workers' compensation insurance.

---

[22]  A determination as to whether a financial hardship warrants PTO Conversion is left to the discretion of Debtors' management.

[23]Certain state and local authorities where the Debtors operate may impose requirements on the accrual of vacation and/or sick days.  The Debtors seek authority to continue to comply with such state and local requirements in accordance with applicable law.

### i.      Medical Insurance

120.    The Debtors offer eligible, full-time Employees and their families medical insurance coverage.  Except for plans offered to their employees in Hawaii and Puerto Rico, the Debtors self-insure their medical insurance coverage (the "Self-Insured Medical Insurance"), which is administered by United Healthcare Services, Inc. ("UHC").  Premiums for the Self-Insured Medical Insurance are partially covered by the Debtors, with the remainder paid for by each covered Employee as a deduction from the covered Employees' wages.  The Debtors then pay administrative fees on a monthly basis of approximately $35,000 to UHC to administer the covered Employees' Self-Insured Medical Insurance plans.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate an ongoing monthly obligation of $35,000 in connection with the Self-Insured Medical Insurance.  One payment of $35,000 will become due and owing during the interim period.

121.    Because the Debtors self-insure through the Self-Insured Medical Insurance, they assume the direct risk for payment of any claim for benefits under the Self-Insured Medical Insurance plans.  To mitigate the financial risk, the Debtors maintain stop loss insurance ("Stop-Loss Insurance") provided by UHC.  Under the Stop-Loss Insurance, the Debtors are responsible for all claims exceeding the Employee's deductible under the Self-Insured Medical Insurance plans.  The Stop-Loss Insurance reimburses the Debtors for claims and expenses above $225,000 for each claim.  The Debtors pay approximately $80,000 to UHC on a monthly basis in connection with the Stop-Loss Insurance.  Payments are made in advance.  As of the Petition Date, the Debtors estimate an ongoing monthly obligation of $80,000 in connection with the Self-Insured Medical Insurance.  One payment of $80,000 will become due and owing during the interim period.

122.    Medical claims asserted under the Self-Insured Medical Insurance (the "Medical Claims")[24] are filed against UHC, who, in turn, seeks reimbursement from the Debtors.  The Medical Claims are reconciled by the Debtors on a monthly basis.  Due to the lag time involved in medical billing, the Medical Claims paid in each weekly period arose approximately two months before the payments are made.

123.    Reconciliation of the Medical Claims to allow reimbursement to UHC is necessary to ensure there is no disruption in services for Employees under their Self-Insured Medical Insurance plans.  For the past six months, weekly payments for Self-Insured Medical Claims have averaged approximately $150,000.[25]  As of the Petition Date, $150,000 is due and owing to UHC on account of Medical Claims, all of which may become due and owing during the interim period.

124.    The Debtors also provide fully funded medical insurance (the "Funded Medical Insurance") to eligible, full-time Employees and their families in Hawaii which are administered by Hawaii Medical Service Association ("HMSA").  Premiums for the Funded Medical Insurance are partially covered by the Debtors with the remainder paid for by covered Employees as a deduction in the Employees' wages.  The Debtors then pay HMSA approximately $4,000 on a monthly basis.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate a monthly obligation of $4,000 in connection with the Funded Medical Insurance.  One payment of $4,000 will become due and owing during the interim period.

---

[24]  Medical Claims include claims filed by former Employees receiving COBRA (as defined herein) benefits.

[25]  While the Debtors calculate average weekly payments of approximately $150,000 on account of Self-Insured Medical Claims, it should be noted that a large value claim can affect these average weekly payments. As of the Petition Date, the Debtors are unaware of any such claim that may materially affect the estimates set forth herein, but by this Motion, seek the Court's authority to make all such payments for Self-Insured Medical Claims as they come due and owing during the interim and final periods.

### ii.    Dental Insurance

125.    The Debtors also offer eligible, full-time Employees and their families fully-funded dental insurance coverage (the "Funded Dental Insurance"), which is administered by CIGNA Health and Life Insurance Company and its affiliates ("CIGNA").[26] Premiums for the Funded Dental Insurance are partially covered by the Debtors with the remainder paid for by covered Employees as a deduction from the Employees' wages. The Debtors then pay CIGNA approximately $42,000 on a monthly basis. Payments are made in arrears. As of the Petition Date, the Debtors estimate an ongoing monthly obligation of $42,000 in connection with the Funded Dental Insurance. One payment of $42,000 will become due and owing during the interim period.

### iii.    Vision Insurance

126.    The Debtors also offer eligible, full-time Employees and their families vision insurance coverage (the "Vision Insurance"). The Vision Insurance is fully funded and administered by Vision Service Plan ("VSP").[27] Premiums for the Vison Insurance are fully paid for by each covered Employee as a deduction from the covered Employees' wages. The Debtors then pay approximately $10,000 to VSP on a monthly basis to administer the covered Employees' Vison Insurance plans. Payments are made in arrears. As of the Petition Date, the Debtors estimate an ongoing monthly obligation of $10,000 in connection with the Vision Insurance. One payment of $10,000 will become due and owing during the interim period.

### iv.    Life and Accidental Death & Dismemberment Insurance

1.    The Debtors purchase life and accident death and dismemberment ("AD&D") insurance (the "Company-Provided Life Insurance") from the Standard Insurance Company

---

[26]  The Funded Dental Insurance also includes a plan offered to eligible Employees in Puerto Rico by MCS Healthcare Holdings, LLC.

[27]  The Vision Insurance also includes a plan offered to eligible Employees in Hawaii by HMSA.

("Standard") for each of their eligible, full-time Employees. Similar coverage for eligible, full-time Employees in Puerto Rico is purchased through MCS Healthcare Holdings, LLC ("MCS"). In addition to the Company-Provided Life Insurance, Employees may also purchase from Standard optional life insurance for themselves or their dependents (the "Optional Life Insurance"), the cost of which is deducted from the covered Employee's wages. The Debtors then pay approximately $13,000 to Standard and MCS,[28] in aggregate, for the Company-Provided Life Insurance and the Optional Life Insurance on a monthly basis. Payments are made in arrears. As of the Petition Date, the Debtors estimate a monthly obligation of $13,000, in aggregate, in connection with Company-Provided Life Insurance and Optional Life Insurance. One payment of $13,000 will become due and owing during the interim period.

### v.        Long-Term and Short-Term Disability Insurance

127.        The Debtors purchase basic, long-term disability insurance (the "Basic Long-Term Disability Insurance") from Standard for each of their eligible, full-time Employees. Employees may also purchase from Standard additional, buy-up long-term disability coverage (the "Buy-Up Long-Term Disability Insurance") through deductions from each covered Employee's wages. The Debtors then pay $22,500 to Standard for the Basic Long-Term Disability Insurance and the Buy-Up Long-Term Disability Insurance on a monthly basis. Payments are made in arrears. As of the Petition Date, the Debtors estimate a monthly obligation of $22,500 in connection with Basic Long-Term Disability Insurance. One payment of $22,500 will become due and owing during the interim period.

128.        Eligible Employees may also purchase (i) short-term disability insurance; (ii) accident insurance; (iii) critical illness insurance; and (iv) a hospital indemnity plan

---

[28] The Debtors' monthly payment of approximately $3,500 to MCS also covers fees associated with health and dental plans offered to eligible Employees in Puerto Rico.

(collectively, the "Supplemental Insurance") from Standard through deductions from each of the covered Employee's wages.  The Debtors then pay approximately $6,000 to Standard for the Supplemental Insurance on a monthly basis.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate a monthly obligation of $6,000 in connection with the Supplemental Insurance.  One payment of $6,000 will become due and owing during the interim period.

### vi.        Workers' Compensation Insurance

129.    The Debtors provide workers' compensation insurance for their Employees at the level required by statute for each state in which the Debtors have Employees, administered by numerous insurers (the "Workers' Compensations Insurers").  Annual claims under the Debtors' worker compensation insurance policies (the "Workers' Compensation Insurance Policies") over the past five years have averaged $850,000.  The average monthly costs for the Debtors' workers' compensation insurance, including deductibles, is approximately $37,000.  There is approximately $95,000 accrued by Workers' Compensation Insurers in connection with the Workers' Compensation Insurance Policies, all of which will become due and owing during the interim period.

130.    Certain benefits under the Workers' Compensation Insurance Policies may have been incurred prepetition but have yet to be fully paid, and certain other claims may have been filed prepetition but have yet to be resolved or not yet filed (collectively, the "Unpaid Workers' Compensation Claims").  For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate Unpaid Workers' Compensation Claims during these Cases.  In addition, to the extent any of the Employees assert claims under the Workers' Compensation Insurance Policies, the Debtors request that this Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers'

Compensation Insurance Policies.  This required modification of the automatic stay pertains solely to Unpaid Workers' Compensation Claims.

### c)    Flexible Savings Accounts

131.    The Debtors offer their Employees the option to contribute a portion of their pre-tax wages to a flexible savings account ("FSAs") for use on certain out-of-pocket medical expenses.  Each Employee must determine at the beginning of each enrollment period the amount to put toward the FSA.   The FSAs are administered by Discovery Benefits.[29]  The Debtors do not make any contributions to the FSAs.

### d)    401(k) Plans

132.    The Debtors offer voluntary retirement plans in which eligible Employees may elect to participate (the "401(k) Plans").   The 401(k) Plans allow for automatic pre-tax wage deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  Prepetition, the Debtors matched an Employee's 401(k) Plan contributions dollar for dollar, up to an amount equal to an Employee's first two percent of eligible compensation (the "401(k) Contributions").  Generally, the 401(k) Contributions were made by the Debtors just following each pay date.  As of the Petition Date, the Debtors no longer provide matches on the 401(k) Plans.

133.    The 401(k) Plan is administered by Massachusetts Mutual Life Insurance Company ("Mass Mutual").   There is currently $0 accrued, unpaid and owing to Mass Mutual as of the Petition Date in connection with the 401(k) Plans for administrative costs.  The Debtors also pay a 401(k) advisor, Retirement Benefits Group (the "401(k) Advisor"), quarterly in an aggregate

---

[29]  Discovery Benefits also administers continuing medical benefits to former Employees and their families under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA").  Former Employees cover all costs, including administrative expenses, associated with COBRA benefits and pay these expenses directly to Discovery Benefits. Discovery Benefits then remits payment to the Debtors to cover any Medical Claims that the Debtors have paid in connection with these former Employees.  There is approximately $3,000 accrued, unpaid, and owing to Discovery Benefits as of the Petition Date in connection with administration of the COBRA Benefits, the FSAs, and commuter benefits, all of which will become.

amount of $20,000 per year.  As of the Petition Date, the Debtors owe the 401(k) Advisor approximately $5,000, all of which will become due and owing during the interim period.

### e)    Assistance Program

134.    The Debtors provide to Employees and their families assistance and support on a comprehensive range of issues, including: emotional well-being, family and caregiving, health and wellness, daily living, financial, and legal (the "Assistance Program").  The Assistance Program is intended to provide Employees short-term counseling, with no out of pocket costs and no use of insurance.  The Assistance Program is administered by Standard and the monthly fee is approximately $2,500.  As of the Petition Date, the Debtors estimate a monthly obligation of $2,500 in connection with the Supplemental Insurance.  One payment of $2,500 will become due and owing during the interim period.

### f)    Severance

135.    Prior to the Petition Date, the Debtors maintained a severance program for the benefit of certain executive and non-executive, non-Insider Employees (the "Non-Insider Severance Program").  Pursuant to the Non-Insider Severance Program, eligible Employees, upon termination and on a discretionary basis, were entitled to receive payments at base compensation levels in accordance with standard company practice (the "Non-Insider Severance Benefits").  Although there is no formal policy, the Debtors' standard practice was that Non-Insider Severance Benefits accrue at varying rates, subject to caps, depending on the eligible Employee's years of service and position.

136.    In the last six months, the Debtors paid approximately $46,000 to former Employees on account of Non-Insider Severance Benefits.  As of the Petition Date, the Debtors have terminated the Non-Insider Severance Program.

**I.      Motion Authorizing the Payment of Certain Prepetition Taxes and Fees**

137.      The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to remit and pay certain outstanding prepetition taxes.

138.      In the ordinary course of business, the Debtors incur or collect and remit certain taxes including sales, use, franchise, property, business and occupation, and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of their business and the sale of their products or services at store locations, or through shipments of products purchased through the Debtors' websites to customers.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.  As of the Petition Date, the Debtors estimate that they owe approximately $ 3,139,937 in unremitted Taxes and Fees, which are comprised entirely of current tax obligations, and are not in respect of "catch-up" payments

139.      The Debtors seek authority to pay all prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities, including $2,100,992 on an interim basis and an additional $1,038,944 on a final basis.

**J.      Motion Authorizing the Continuation and Payment of Prepetition Obligations Incurred in Connection with Various Insurance Policies, Insurance Premium Financing Programs, and Maintenance of Customs Surety Bonds**

140.      The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change the Debtors' prepetition insurance policies (each, an "Insurance Policy" and, collectively,

the "Insurance Policies"), or enter into new policies, if necessary, in the ordinary course of business and pay prepetition obligations in respect thereof, and (b) continue the Debtors' insurance premium financing programs (each, a "Financed Program" and, collectively, the "Financed Programs") and, to the extent necessary, revise, extend, renew, supplement, or change the Debtors' Financed Programs, or enter into new financing programs, as necessary, in the ordinary course of business and pay prepetition obligations in respect thereof, and (ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing.

### 1.  Overview of the Insurance Policies

141.    In connection with their business operations, the Debtors maintain multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations.  The Insurance Policies include (a) general liability, (b) automobile liability, (c) umbrella liability, (d) property, (e) flood, (f) directors and officers liability, (g) fiduciary liability, (h) commercial crime, (i) workers' compensation and employers' liability, and (j) cyber liability.

142.    The total annual premiums under the current Insurance Policies are approximately $1,665,923 including all related fees and charges.  These premiums are paid to the relevant insurance carriers (collectively, the "Insurance Carriers") either as annual prepayments or as installment payments, including through the Financing Agreements (defined below).  The Debtors do not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies.  In an abundance of caution, the Debtors seek authority to pay any prepetition amounts in respect of the Insurance Policies, in an amount not to exceed $ 349,219.78 on an interim basis and $ 1,665,923 on a final basis, and to continue to pay post-petition costs with

respect to the Insurance Policies in the ordinary course of business during the pendency of these chapter 11 cases.

143.     Certain of the Insurance Policies are subject to regular audits (the "<u>Insurance Policy Audits</u>"), which may result in an adjustment of the premium payments.  Certain of these Insurance Policy Audits will not conclude until after the Petition Date and, therefore, the amount of potential Insurance Policy Audit related premium adjustments is difficult to know with certainty at this time. Accordingly, the Debtors seek the authority, but not the direction, to honor any increase amounts owed on account of any Insurance Policy Audits in the ordinary course of business.

### 2.     Overview of Financed Programs

144.     In addition, certain of the Debtors' premiums are financed, because it is not economically advantageous for the Debtors to pay those premiums in full on a lump-sum basis. The Financed Programs are financed pursuant to premium financing agreements (the "<u>Financing Agreements</u>") with First Insurance Funding ("<u>FIF</u>").  Prior to the Petition Date, the Debtors entered into Financing Agreements for cyber insurance (the "<u>Cyber Financing Agreement</u>") and other insurance (the "<u>Additional Financing Agreement</u>").

145.     Under the Cyber Financing Agreement, the Debtors made a down payment of approximately $7,157.02 and received a loan in the amount of $64,413.21, plus a $1,811.58 finance charge, at an annual percentage interest rate of 6.7%.  The Debtors are obligated to make monthly payments of $7,358.31 on the 27th of each month in advance for the following month. The Debtors have made 5 of their 9 payments under the Cyber Financing Agreement and are current on their obligations thereunder.  The Debtors will be obligated to make the next payment on February 27, 2019.

146.     Under the Additional Financing Agreement, the Debtors are required to make a down payment of approximately $99,385.54 and receive a loan in the amount of $885,262.86, plus a $16,197.30 finance charge and $1,855.00 in taxes and fees, at an annual percentage interest rate of 4.370%.  The Debtors are obligated to make monthly payments of $100,162.24 on the 28th of each month in advance for the following month.  The Debtors have not made any payments under the Additional Financing Agreement and are current on their obligations thereunder.

147.     As of the Petition Date, the Debtors believe there is approximately $36,000 owing with respect to the Cyber Financing Agreement and $0 owing with respect to the Additional Financing Agreement.  The Debtors seek authority to pay any prepetition amounts in respect of the Financing Agreements, in an amount not to exceed $349,219.78 on an interim basis and $1,665,923.00 on a final basis, and to continue to pay post-petition costs with respect to the Financing Agreements in the ordinary course of business during the pendency of these cases.

**3.     Brokerage and Administrative Services**

148.     In connection with the procurement and maintenance of their Insurance Policies, the Debtors obtain brokerage services from Marsh & McLennan Insurance Agency LLC (the "Broker").  The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors' with the procurement and negotiation of the Insurance Policies, and enabling the Debtors to obtain those policies on advantageous terms and at competitive rates.  Historically, the Debtors have paid the Broker approximately $150,000 in the aggregate on an annual basis for its services (the "Brokerage Fees").  Prior to the Petition Date, the Debtors received an invoice from the Broker in the amount of $50,000 (due upon receipt) on account of certain Brokerage Fees.  Thus, the Debtors seek authority to pay any prepetition amounts in respect of the Brokerage Fees on any amounts owing on a final basis, and to continue

to pay post-petition costs with respect to the Brokerage Fees in the ordinary course of business during the pendency of these Cases.

### 4. Customs Surety Bonds

149.     In the ordinary course of business, the Debtors are required to provide surety bonds (the "Customs Surety Bonds") to the United States Customs and Border Protection Agency ("U.S. Customs") to secure the Debtors' payment or performance of certain obligations, including duties, taxes, and fees on account of merchandise imported from foreign countries.  The Debtors are required to post surety bonds to secure these obligations pursuant to 19 U.S.C. § 1623, which grants U.S. Customs the authority to require bonds "as they may deem necessary for the protection of the revenue or to assure compliance with any provision of law, regulation, or instruction which the Secretary of the Treasury of the Customs Service may be authorized to enforce."  19 U.S.C. § 1623(a).  As such, failing to provide, maintain, or timely replace the Customs Surety Bonds will prevent the Debtors from importing merchandise that is essential to replenishing the Debtors' store inventory and, thus, invigorating the Debtors' operations.  As of the Petition Date, the Debtors' obligations to U.S. Customs are secured by one Customs Surety Bond totaling approximately $900,000.00. The Debtors pay the Broker an annual premium of approximately $2,200.00 to maintain the Customs Surety Bonds.

150.     The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to the surety.  Unlike an insurance policy, if a surety incurs a loss on a surety bond, it is entitled to recover the full amount of that loss from the principal.  To that end, Fidelity and Deposit Company of Maryland has required the Debtors to issue a letter of credit (the "Letter of Credit") in the amount of $920,000.00 to back the Customs Surety Bonds and effectively indemnify Fidelity and Deposit Company of Maryland from any loss, cost, or expense

it may incur on account of the issuance of the Customs Surety Bonds.  Bank of America, N.A., has issued the Letter of Credit needed to maintain the Debtors' access to the Customs Surety Bonds.

151.    To continue their business operations during the reorganization process, the Debtors must be able to provide financial assurance to U.S. Customs.  This, in turn, requires the Debtors to maintain the existing Customs Surety Bonds.  Accordingly, the Debtors seek authority to pay bond premiums as they come due, maintain and renew the Letter of Credit, renew or potentially acquire additional bonding capacity as needed in the ordinary course of business, and execute other agreements, as needed.  Failing to provide, maintain, back, or timely replace Customs Surety Bonds will prevent the Debtors from complying with their federal law obligations, and consequently prevent them from undertaking essential functions related to their operations, such as importing goods.

## Need for Relief Sought in First Day Motions

152.    The Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain financing and make certain critical payments and otherwise continue operating in the ordinary course of business as sought in the First Day Motions. In my opinion, approval of the relief requested in the First Day Motions will minimize disruptions to the Debtors' operations, thereby preserving and maximizing the value of the Debtors' estates for the benefits of their creditors, employees and customers.

153.    Accordingly, I respectfully request that the Court grant all of relief requested in the First Day Motions and such other and further relief as may be just and appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

New York, New York                    */s/ Brian M. Cashman*
February 3, 2019                      Brian M. Cashman
                                      Berkeley Research Group LLC

                                      *Proposed Chief Restructuring Officer to the Debtors*