**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Charlotte Russe Holding, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 19-10210 (___)<br><br>(Joint Administration Requested) |

**MOTION FOR INTERIM AND FINAL ORDERS**
**AUTHORIZING (I) PAYMENT OF WAGES, COMPENSATION AND**
**EMPLOYEE BENEFITS AND (II) FINANCIAL INSTITUTIONS TO HONOR**
**AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

Charlotte Russe Holding, Inc. and its chapter 11 affiliates, the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Proposed Interim Order" and the "Proposed Final Order," respectively, and together, the "Proposed Orders"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing, but not requiring, the Debtors to (i) pay, in their sole discretion, Wage Obligations, Expense Reimbursements, Payroll Processing Fees, and Payroll Taxes (each as defined below, and collectively, the "Employee Obligations"), as well as costs incident to the foregoing, (ii) maintain and continue to honor their employee practices, programs, and policies (the "Employee Benefits"), (iii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and

---

[1]  The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Charlotte Russe Holding, Inc. (4325); Charlotte Russe Holdings Corporation (1045); Charlotte Russe Intermediate Corporation (6345); Charlotte Russe Enterprise, Inc. (2527); Charlotte Russe, Inc. (0505); Charlotte Russe Merchandising, Inc. (9453); and Charlotte Russe Administration, Inc. (9456).  The Debtors' headquarters are located at 5910 Pacific Center Boulevard, Suite 120, San Diego, CA 92121.

process check and electronic transfer requests related to the foregoing; and (iv) granting related relief.  In support of the Motion, the Debtors rely on the *Declaration of Brian M. Cashman, Chief Restructuring Officer of Charlotte Russe Holding, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>")[2] concurrently filed herewith.  In further support of the Motion, the Debtors respectfully represent as follows:

**JURISDICTION**

1.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("<u>Local Rules</u>"), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      The statutory and legal predicates for the relief requested herein are sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

**BACKGROUND**

4.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

5.      The Debtors are authorized to continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in these Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

6.      Founded in 1975, Charlotte Russe is a specialty fashion retailer of young women's apparel and accessories.  Headquartered in San Diego, California, the Debtors sell their merchandise to customers in the contiguous 48 states, Hawaii, and Puerto Rico through their online store and 512 brick-and-mortar stores located in various regional malls, outlet centers, and lifestyle centers.

7.      In addition, the Debtors acquired the Peek brand in 2016, which offers playfully inspired designer clothing for babies, boys and girls ranging in age from infant to 12 years old.  The Peek brand allows the Debtors to reach a secondary market, offering an array of children's apparel and shoes as well as toys and accessories.  The Debtors operate ten Peek store locations in seven states as well as an e-commerce website, www.peekkids.com, and Peek is also distributed at wholesale to a few third-party retailers, most significantly Nordstrom.

8.      As is further discussed in the First Day Declaration, the Debtors commenced these chapter 11 cases to effectuate a sale of the Debtors' assets pursuant to a Court-approved bidding and auction process.

9.      More detailed factual background regarding the Debtors and the commencement of these Cases is set forth in the First Day Declaration.

I.      **The Debtors' Employee Obligations**

10.      In the ordinary course of business, the Debtors incur payroll and employee benefits obligations to their employees for the performance of services.  As of the Petition Date, the Debtors

employ approximately 8,744 individuals (the "Employees"), approximately 1,412 of whom are full-time and none of whom are members of a union.

11.     The Debtors incurred outstanding Employee Obligations and Employee Benefits relating to the period prior to the Petition Date.  Certain of these costs and obligations are outstanding, due and payable now, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date, most of which will become due and owing before final relief can be granted.

12.     The Debtors do not seek authority to pay any prepetition amounts in excess of $12,850 per Employee on an interim basis.

### A.     Wages and Salaries

13.     Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages, commissions, and salaries for their Employees every two weeks in arrears (the "Wage Obligations").  The Debtors' last payroll payment was made on January 25, 2019.  The Debtors' currently estimated payroll during the pay-period ending February 2, 2019, including estimated employer payroll tax obligations, is approximately $5.0 million and is scheduled to be paid on or about February 8, 2019.

14.     All Wage Obligations accrued before the Petition Date compensate Employees for work already performed.  As a result, accrued outstanding Wage Obligations for the prepetition period for the Debtors aggregate approximately $5.0 million, which is inclusive of estimated employer payroll tax obligations.

### B.     Payroll Processing Fees

15.     Certain Withholding Obligations for the Debtors' Employees are processed and administered by ADP, LLC.  The Debtors pay approximately $15,000 per pay period for such

services.   As of the Petition Date, the Debtors estimate they owe $215,000[3] on account of prepetition payroll services (the "Payroll Processing Fees"), all of which will come due within the first 30 days of these chapter 11 cases.

> C.      **Payroll Taxes**

16.      The Debtors are required by law to withhold from the Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").   In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").

> D.      **Expense Reimbursements**

17.      The Debtors' Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses.   Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' business, the Employees are reimbursed in full (the "Expense Reimbursements") after submission of appropriate expense reimbursement reports to the Employee's manager and the accounting department.   Expense reports must be submitted by the Employee according to the expense report schedule, and must include, *inter alia*: (i) the amount of the expense; (ii) the time and place of travel; (iii) the business purpose for the expense; and (iv) the identity and business relationship of others who participated in the event.   In addition,

---

[3] Of this, $200,000 reflects an annual fee associated with the processing of employee W-2s.

prior to the Petition Date the Debtors issued company credit cards that Employees could use to pay for business related expenses.  The balances on the credit cards are paid directly by the Employees, who are then reimbursed by the Debtors, and Employee-cardholders may be held personally liable for unpaid credit card balances.  The Debtors believe it is necessary to allow payment of unpaid credit card expenses incurred during the period prior to the Petition Date as part of the Expense Reimbursements to limit any potential liability Employee-cardholders may have.

18.    In the six-month period prior to the Petition Date, Expense Reimbursements averaged approximately $190,000 per month.  The Debtors estimate that there are Expense Reimbursements currently outstanding in the approximate amount of $114,000.  However, Employees may have incurred expenses before the Petition Date that have not yet submitted requests for reimbursement that may increase this amount.

## II.    The Debtors' Employee Benefits[4]

19.    In the ordinary course of business, the Debtors established various Employee Benefits for their eligible Employees that can be divided into the following categories: (i) paid time-off plans, including vacation days (the "PTO Plans"); (ii) insurance, including medical, vision, dental, life, and short-term and long-term disability insurance (collectively, the "Health and Welfare Plans"); (iii) Flexible Savings Accounts (as defined herein); (iv) 401(k) Plans (as defined herein); and (v) an assistance program in connection with Employee well-being (the "Assistance Program").  The Debtors directly deduct specified amounts from Employees' wages in connection with certain of the Employee Benefits.

---

[4] In addition to the Employee Benefits detailed herein, the Debtors have heretofore offered bonus incentives to certain non-insiders based on pre-determined monthly or quarterly goals related to, among other things, sales, accuracy, and safety.  The Debtors are not seeking authority to continue these programs as of the Petition Date.  The estimated aggregate of such accrued but unpaid bonuses for January is $80,000.

## A.      Paid Time-Off Benefits

20.      Under the PTO Plans, eligible Employees may receive their full wages for days not worked ("PTO").  PTO may be used for any reason, including vacation, sickness, medical appointments, or other personal reasons.  All full-time salaried and hourly employees are eligible to accrue up to five weeks of PTO a year depending on the Employee's position and length of employment.  Except as provided by applicable law,[5] an Employee's accrued PTO cannot exceed the Employee's annual accrual amount.

21.      In addition, the Debtors provide certain other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, and (c) other paid and unpaid leaves of absence for personal reasons, including for bereavement and those required by law.  Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

22.      In addition to Employees using PTO in the ordinary course of business, prior to the Petition Date, eligible Employees could convert unused and accrued PTO (the "PTO Conversion") to an immediate cash payout due to financial hardship.[6]  The PTO Conversion program was terminated as of the Petition Date.  Moreover, Employees may receive an immediate cash payout of accrued and unused PTO upon voluntary resignation of an Employee after proper notice is given or upon termination of an Employee without cause (the "Termination Payout").  The Debtors' current, eligible Employees have accrued approximately $2.5 million in unused time in connection

---

[5]  Certain state and local authorities where the Debtors operate may impose additional requirements on the accrual of PTO in lieu of vacation and/or sick days.  The Debtors seek authority to continue to comply with such state and local requirements in accordance with applicable law.

[6]  A determination as to whether a financial hardship warrants PTO Conversion is left to the discretion of Debtors' management.

with the PTO Plans as of the Petition Date.  Eligible Employees stopped accruing benefits under the PTO Plans as of the Petition Date.[7]

### B.    Health and Welfare Plans

23.    The Debtors sponsor several Health and Welfare Plans to provide benefits to eligible Employees, including, without limitation, (i) medical, dental, or other health-related plans, (ii) life insurance, (iii) short-term and long-term disability insurance, and (iv) workers' compensation insurance.

### 1.    Medical Insurance

24.    The Debtors offer eligible, full-time Employees and their families medical insurance coverage.  Except for plans offered to their employees in Hawaii and Puerto Rico, the Debtors self-insure their medical insurance coverage (the "Self-Insured Medical Insurance"), which is administered by United Healthcare Services, Inc. ("UHC").  Premiums for the Self-Insured Medical Insurance are partially covered by the Debtors, with the remainder paid for by each covered Employee as a deduction from the covered Employees' wages.  The Debtors then pay administrative fees on a monthly basis of approximately $35,000 to UHC to administer the covered Employees' Self-Insured Medical Insurance plans.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate an ongoing monthly payment of $35,000 in connection with the Self-Insured Medical Insurance.  One payment of $35,000 will become due and owing during the interim period.

25.    Because the Debtors self-insure through the Self-Insured Medical Insurance, they assume the direct risk for payment of any claims for benefits under the Self-Insured Medical

---

[7] Certain state and local authorities where the Debtors operate may impose requirements on the accrual of vacation and/or sick days.  The Debtors seek authority to continue to comply with such state and local requirements in accordance with applicable law.

Insurance plans.  To mitigate the financial risk, the Debtors maintain stop loss insurance ("Stop-Loss Insurance") provided by UHC.  Under the Stop-Loss Insurance, the Debtors are responsible for all claims exceeding the Employee's deductible under the Self-Insured Medical Insurance plans.  The Stop-Loss Insurance reimburses the Debtors for claims and expenses above $225,000 for each claim.  The Debtors pay approximately $80,000 to UHC on a monthly basis in connection with the Stop-Loss Insurance.  Payments are made in advance.  As of the Petition Date, the Debtors estimate an ongoing monthly payment of $80,000 in connection with the Stop-Loss Insurance. One payment of $80,000 will become due and owing during the interim period.

26.     Medical claims asserted under the Self-Insured Medical Insurance (the "Medical Claims")[8] are filed against UHC, who, in turn, seeks reimbursement from the Debtors.  The Medical Claims are reconciled by the Debtors on a monthly basis.  Due to the lag time involved in medical billing, the Medical Claims paid in each weekly period arose approximately two months before the payments are made.

27.     Reconciliation of the Medical Claims to allow reimbursement to UHC is necessary to ensure there is no disruption in services for Employees under their Self-Insured Medical Insurance plans.  For the past six months, weekly payments for Self-Insured Medical Claims have averaged approximately $150,000.[9]  As of the Petition Date, $150,000 is due and owing to UHC on account of Medical Claims, all of which may become due and owing during the interim period.

28.     The Debtors also provide fully funded medical insurance (the "Funded Medical Insurance") to eligible, full-time Employees and their families in Hawaii which are administered

---

[8]  Medical Claims include claims filed by former Employees receiving COBRA (as defined herein) benefits.

[9]  While the Debtors calculate average weekly payments of approximately $150,000 on account of Self-Insured Medical Claims, it should be noted that a large value claim can affect these average weekly payments.  As of the Petition Date, the Debtors are unaware of any such claim that may materially affect the estimates set forth herein, but by this Motion, seek the Court's authority to make all such payments for Self-Insured Medical Claims as they come due and owing during the interim and final periods.

by Hawaii Medical Service Association ("HMSA").  Premiums for the Funded Medical Insurance are partially covered by the Debtors with the remainder paid for by covered Employees as a deduction in the Employees; wages.  The Debtors then pay HMSA approximately $4,000 on a monthly basis.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate a monthly obligation of $4,000 in connection with the Funded Medical Insurance.  One payment of $4,000 will become due and owing during the interim period.

### 2.    Dental Insurance

29.    The Debtors also offer eligible, full-time Employees and their families fully-funded dental insurance coverage (the "Funded Dental Insurance"), which is administered by CIGNA Health and Life Insurance Company and its affiliates ("CIGNA").[10]  Premiums for the Funded Dental Insurance are partially covered by the Debtors with the remainder paid for by covered Employees as a deduction from the Employees' wages. The Debtors then pay CIGNA approximately $42,000 on a monthly basis.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate a monthly obligation of $42,000 in connection with the Funded Dental Insurance.  One payment of $42,000 will become due and owing during the interim period.

### 3.    Vision Insurance

30.    The Debtors also offer eligible, full-time Employees and their families vision insurance coverage (the "Vision Insurance").  The Vision Insurance is fully funded and administered by Vision Service Plan ("VSP").[11]  Premiums for the Vison Insurance are fully paid for by each covered Employee as a deduction from the covered Employees' wages.  The Debtors then pay approximately $10,000 to VSP on a monthly basis to administer the covered Employees'

---

[10]  The Funded Dental Insurance also includes a plan offered to eligible Employees in Puerto Rico by MCS Healthcare Holdings, LLC.

[11]  The Vision Insurance also includes a plan offered to eligible Employees in Hawaii by HMSA.

Vison Insurance plans.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate a monthly obligation of $10,000 in connection with the Vision Insurance.  One payment of $10,000 will become due and owing during the interim period.

### 4.    Life and AD&D Insurance

31.    The Debtors purchase life and accident death and dismemberment ("AD&D") insurance (the "Company-Provided Life Insurance") from the Standard Insurance Company ("Standard") for each of their eligible, full-time Employees.  Similar coverage for eligible, full-time Employees in Puerto Rico is purchased through MCS Healthcare Holdings, LLC ("MCS"). In addition to the Company-Provided Life Insurance, Employees may also purchase from Standard optional life insurance for themselves or their dependents (the "Optional Life Insurance"), the cost of which is deducted from the covered Employee's wages.  The Debtors then pay approximately $13,000 to Standard and MCS,[12] in aggregate, for the Company-Provided Life Insurance and Optional Life Insurance on a monthly basis.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate a monthly obligation of $13,000 in connection with the Company-Provided Life Insurance and the Optional Life Insurance.  One payment of $13,000 will become due and owing during the interim period.

### 5.    Long-Term and Short-Term Disability Insurance

32.    The Debtors purchase basic, long-term disability insurance (the "Basic Long-Term Disability Insurance") from Standard for each of their eligible, full-time Employees.  Employees may also purchase from Standard additional, buy-up long-term disability coverage (the "Buy-Up Long-Term Disability Insurance") through deductions from each covered Employee's wages.  The Debtors then pay $22,500 to Standard for the Basic Long-Term Disability Insurance and the Buy-

---

[12]  The Debtors' monthly payment of approximately $3,500 to MCS also covers fees associated with health and dental plans offered to eligible employees in Puerto Rico.

Up Long-Term Disability Insurance on a monthly basis.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate a monthly obligation of $22,500 in connection with Basic Long-Term Disability Insurance.  One payment of $22,500 will become due and owing during the interim period.

33.    Eligible Employees may also purchase (i) short-term disability insurance; (ii) accident insurance; (iii) critical illness insurance; and (iv) a hospital indemnity plan (collectively, the "Supplemental Insurance") from Standard through deductions from each of the covered Employee's wages.  The Debtors then pay approximately $6,000 to Standard for the Supplemental Insurance on a monthly basis.  Payments are made in arrears.  As of the Petition Date, the Debtors estimate a monthly obligation of $6,000 in connection with the Supplemental Insurance.  One payment of $6,000 will become due and owing during the interim period.

### 6.    Workers' Compensation Insurance

34.    The Debtors provide workers' compensation insurance for their Employees at the level required by statute for each state in which the Debtors have Employees, administered by numerous insurers (the "Workers' Compensations Insurers").  Annual claims under the Debtors' worker compensation insurance policies (the "Workers' Compensation Insurance Policies") over the past five years have averaged $850,000.  Average monthly costs for the Debtors' workers' compensation insurance, including deductibles, are approximately $37,000.  There is approximately $95,000 accrued by Workers' Compensation Insurers in connection with the Workers' Compensation Insurance Policies, approximately all of which will become due and owing during the interim period.

35.    Certain benefits under the Workers' Compensation Insurance Policies may have been incurred prepetition but have yet to be fully paid, and certain other claims may have been filed prepetition but have yet to be resolved or not yet filed (collectively, the "Unpaid Workers'

Compensation Claims"). For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate Unpaid Workers' Compensation Claims during these Cases. In addition, to the extent any of the Employees assert claims under the Workers' Compensation Insurance Policies, the Debtors request that this Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Insurance Policies. This required modification of the automatic stay pertains solely to Unpaid Workers' Compensation Claims.

### C.      Flexible Savings Accounts

36.      The Debtors offer their Employees the option to contribute a portion of their pre-tax wages to a flexible savings account ("FSAs") for use on certain out-of-pocket medical expenses. Each Employee must determine at the beginning of each enrollment period the amount to put toward the FSA. The FSAs are administered by Discovery Benefits.[13] The Debtors do not make any contributions to the FSAs.

### D.      401(k) Plans

37.      The Debtors offer voluntary retirement plans in which eligible Employees may elect to participate (the "401(k) Plans"). The 401(k) Plans allow for automatic pre-tax wage deductions of eligible compensation up to the limits set forth by the Internal Revenue Code. Prepetition, the Debtors matched an Employee's 401(k) Plan contributions dollar for dollar, up to

---

[13] Discovery Benefits also administers continuing medical benefits to former Employees and their families under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"). Former Employees cover all costs, including administrative expenses, associated with COBRA benefits and pay these expenses directly to Discovery Benefits. Discovery Benefits then remits payment to the Debtors to cover any Medical Claims that the Debtors have paid in connection with these former Employees. There is approximately $3,000 accrued, unpaid, and owing to Discovery Benefits as of the Petition Date in connection with administration of the COBRA Benefits, the FSAs, and commuter benefits, all of which will come due during the interim period.

an amount equal to an Employee's first two percent of eligible compensation (the "401(k) Contributions"). Generally, the 401(k) Contributions were made by the Debtors just following each pay date. As of the Petition Date, the Debtors no longer provide matches on the 401(k) Plans.

38.    The 401(k) Plan is administered by Massachusetts Mutual Life Insurance Company ("Mass Mutual"). There is currently $0 accrued, unpaid and owing to Mass Mutual as of the Petition Date in connection with the 401(k) Plans for administrative costs.

39.    The Debtors also pay a 401(k) advisor, Retirement Benefits Group (the "401(k) Advisor"), quarterly in an aggregate amount of $20,000 per year. As of the Petition Date, the Debtors owe the 401(k) Advisor approximately $5,000, all of which will become due and owing during the interim period.

### E.    Assistance Program

40.    The Debtors provide to Employees and their families assistance and support on a comprehensive range of issues, including: emotional well-being, family and caregiving, health and wellness, daily living, financial, and legal (the "Assistance Program"). The Assistance Program is intended to provide Employees short-term counseling, with no out of pocket costs and no use of insurance. The Assistance Program is administered by Standard and the monthly fee is approximately $2,500. As of the Petition Date, the Debtors estimate a monthly obligation of $2,500 in connection with the Assistance Program. One payment of $2,500 will become due and owing during the interim period.

### F.    Severance

41.    Prior to the Petition Date, the Debtors maintained a severance program for the benefit of certain executive and non-executive, non-Insider Employees (the "Non-Insider Severance Program"). Pursuant to the Non-Insider Severance Program, eligible Employees, upon termination and on a discretionary basis, were entitled to receive payments at base compensation

levels in accordance with standard company practice (the "Non-Insider Severance Benefits"). Although there is no formal policy, the Debtors' standard practice was that Non-Insider Severance Benefits accrue at varying rates, subject to caps, depending on the eligible Employee's years of service and position.

42.    In the last six months, the Debtors paid approximately $46,000 to former Employees on account of Non-Insider Severance Benefits.  As of the Petition Date, the Debtors have terminated the Non-Insider Severance Program.

### RELIEF REQUESTED

43.    By this Motion, the Debtors request, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, entry of the Interim Order and Final Order authorizing, but not requiring, the Debtors to (i) pay to the Debtors' employees up to $7.62 million, which is comprised of (a) Wage Obligations in the amount of approximately $5.0 million; (b) Expense Reimbursements in the amount of $114,000; and (c) up to $2.5 million on account of the Debtors' PTO Plans, of which approximately $750,000 is sought on an interim basis with the remainder authorized to be paid out on a final basis; and (ii) pay third party vendors/administrators in connection with the Employee Benefits in the amount of approximately $983,000 in the interim period and up to $1.03 million monthly on a final basis.

44.    Additionally, the Debtors request the Court authorize all applicable banks and financial institutions (the "Banks") to receive, process, honor, and pay all prepetition and post-petition checks issued or to be issued, and electronic fund transfers requested or to be requested, by the Debtors in connection with the Employee Obligations and Employee Benefits.

**BASIS FOR RELIEF**

**III.    Cause Exists to Authorize Payment to the Debtors' Employees.**

> **A.    The Debtors' Employee Obligations And Employee Benefits Constitute Priority Claims Under The Bankruptcy Code.**

45.    The Debtors' Employee Obligations and Employee Benefits relating to the period before the Petition Date constitute priority claims under the Bankruptcy Code.  Pursuant to section 507(a)(4)(A) of the Bankruptcy Code, claims against the Debtors for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $12,850 per individual.  11 U.S.C. § 507(a)(4)(A).  Similarly, section 507(a)(5) of the Bankruptcy Code provides that Employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status to the extent of $12,850.00 per Employee covered by such plan, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code.  *See* 11 U.S.C. § 507(a)(5).

46.    The Debtors' Employee Obligations and Employee Benefits described above clearly constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code.  As priority claims, these obligations must be paid in full before any general unsecured obligations of the Debtors may be satisfied.  Accordingly, the relief requested may affect only the timing of the payment of these priority obligations, and will not prejudice the rights of general unsecured creditors.

> **B.    Satisfaction Of The Debtors' Prepetition Employee Obligations And Employee Benefits Are Appropriate Under The Necessity Of Payment Doctrine.**

47.    In addition to the foregoing, the Debtors submit that satisfaction and payment of the Employee Obligations and Employee Benefits is necessary and appropriate and may be authorized under sections 105(a) and 363(b) of the Bankruptcy Code pursuant to the "necessity of

payment" doctrine.  The Debtors, however, do not seek authority to pay any such amount in excess of the statutory cap on an interim basis.

48.     The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition employee wages and benefits); *see also Mich. Bureau of Workers' Disability Compensation v. Chateaugay Corp. (In re Chateaugay Corp.),* 80 B.R. 279, 285-86 (S.D.N.Y. 1987), *appeal dismissed* 838 F.2d 59 (2d Cir. 1988) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).  This doctrine is consistent with the paramount goal of chapter 11 of "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.

49.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175. "Under Section 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177).

50.     Furthermore, section 363(b)(1) of the Bankruptcy Code provides, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

51.     Any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with their Employees at a time when the Employees' support is critical to the success of these Cases.  At this early stage, the Debtors simply cannot risk the substantial damage to their business that would inevitably attend any decline in their Employees' morale.

52.     Absent an order granting the relief requested herein, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the Employees to meet their own personal financial obligations.  Without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives.  In addition, it would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtors, with the understanding that they would be reimbursed.

53.     With respect to Payroll Taxes in particular, the payment of such taxes will not prejudice other creditors of the Debtors' estate, as the relevant Taxing Authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code with respect to such obligations.  Moreover, the portion of the Payroll Taxes withheld from an Employee's wages on behalf of the applicable Taxing Authority is held in trust by the Debtors.  As such, these Payroll Taxes are not property of the Debtors' estate under section 541 of the Bankruptcy Code. *See, e.g.*, *Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estate).

54.     In addition, the Debtors believe it is necessary to continue payment of administrative fees to the administrators of the Debtors' Employee Obligations and Employee Benefits.  Without the continued services of these administrators, the Debtors would be unable to continue to honor their Wage Obligations and Employee Benefits obligations in an efficient and cost-effective manner.

55.     The Debtors do not seek to alter any of their Employee Benefits at this time.  This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtors, in their discretion, to continue to honor their practices, programs, and policies with respect to its Employees, as such practices, programs, and policies were in effect as of the Petition Date.  Payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest, and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption.

56.     As explained more fully above, the Debtors' Employees are central to their operations and are vital to these Cases.  A significant deterioration in employee morale at this critical time would have a devastating impact on the Debtors, their clients and vendors, the value of the Debtors' assets and businesses, and the Debtors' ability to continue operations.  Moreover, the total amount sought to be paid herein is relatively modest compared with the size of the Debtors' overall business and the importance of the Employees to the Cases.

57.     In other chapter 11 cases, courts in this District have approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those

described herein.  *See, e.g.*, *In re J & M Sales Inc.*, Case No. 18-11801 (LSS) (Bankr. D. Del. Aug. 7, 2018) [D.I. 80] (authorizing the debtors to pay prepetition wages, compensation, and maintain and continue benefits in the ordinary course); *In re Brookstone Holdings Corp.*, Case No. 18-11780 (BLS) (Bankr. D. Del. Aug. 3, 2018) [D.I. 67] (same); *In re RMH Franchise Holdings, Inc.*, Case No. 18-11092 (BLS) (Bankr. D. Del. May 15, 2018) [D.I. 61] (same); *In re The Relay Shoe Company, LLC*, Case No. 18-11145 (LSS) (Bankr. D. Del. May 15, 2018) [D.I. 57] (same).[14]

58.    Accordingly, by this Motion, the Debtors seek authority pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to pay Employee Obligations as they become due and owing during the pendency of these chapter 11 cases and to continue, uninterrupted, their practices, programs, policies, and payments with respect to its Employee Benefits, as such practices, programs, and policies were in effect as of the Petition Date.

**IV.    Applicable Banks Should Be Authorized to Honor and Pay Checks Issued and Make Other Transfers to Pay Employee Obligations.**

59.    Under the Debtors' existing cash management system,[15] the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Obligations and Employee Benefits.  The Debtors, therefore, further request that this Court authorize applicable Banks to receive, process, honor, and pay all prepetition and post-petition checks issued or to be issued, and electronic fund transfers requested or to be requested, by the Debtors in connection with the Employee Obligations and Employee Benefits.  The Debtors

---

[14] Because of the voluminous nature of the unreported orders cited herein, they are not annexed to this Motion. Copies of these orders are available upon email request of Debtors' counsel by contacting Summer McKee, Esq. at smckee@cooley.com.

[15] For further information regarding the Debtors' cash management system, see the *Debtors' Motion For Entry Of Order (I) Authorizing Continued Use Of Cash Management System, (II) Authorizing Continued Use Of Existing Business Forms (III) Authorizing The Continuation Of Intercompany Transactions, (IV) Granting Administrative Priority Status To Post-petition Intercompany Transactions, (V) Authorizing Use Of Prepetition Bank Accounts, Account Control Agreements, And Certain Payment Methods, And (VI) Waiving The Requirements Of 11 U.S.C. § 345(B) On An Interim Basis* filed contemporaneously with this Motion, and the First Day Declaration.

also seek authority to issue new post-petition checks, or effect new electronic fund transfers, on account of the Employee Obligations and Employee Benefits to replace any prepetition checks or electronic fund transfer requests that may have already been dishonored or rejected.

60.    Authorization to pay all amounts on account of Employee Obligations and Employee Benefits shall not be deemed to constitute post-petition assumption or adoption of any contract, program, or policy pursuant to section 365 of the Bankruptcy Code.  The Debtors are in the process of reviewing these matters and reserve all of their rights under the Bankruptcy Code with respect thereto.  Moreover, authorization to pay all amounts on account of Employee Obligations and Employee Benefits shall not affect the Debtors' right to contest the amount or validity of any such claims, including without limitation, the Payroll Taxes that may be due to any Taxing Authority.

## V.    Cause Exists To Waive The Automatic Stay With Respect To The Workers' Compensation Insurance Policies.

61.    Section 362(a) of the Bankruptcy Code operates as a stay with respect to "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced" before the Petition Date.  11 U.S.C. § 362(a)(1).

62.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Insurance Policies in the appropriate judicial or administrative forum or to allow Unpaid Workers' Compensation Claims to be filed that may have arisen in the prepetition period.  Under various state laws, the Debtors must maintain their Workers' Compensation Insurance Policies to ensure prompt and efficient payment of applicable claims.  If the Debtors fail to maintain their Workers' Compensation Insurance Policies, they may be prohibited by state law from operating in those

states without making significant adjustments.  Payment of all amounts due under the Workers' Compensation Insurance Policies, therefore, is crucial to the continued operation of the Debtors' business.

## IMMEDIATE RELIEF IS NECESSARY

63.     Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed.  R. Bankr. P. 6003.  As set forth throughout this Motion, any disruption of the Employee Obligations, would substantially diminish or impair the Debtors' efforts in their Cases to preserve and maximize the value of their estates.

64.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF ANY APPLICABLE STAY

65.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the 14 day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

66.     Nothing in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an

admission as to the validity of any claim against the Debtors and their estates, (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates, (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action against an Insurance Carrier, or (iv) shall be construed as a promise to pay a claim.

## **NOTICE**

67.    The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) holders of the 30 largest unsecured claims on a consolidated basis against the Debtors; (iii) the Prepetition ABL Agent; (iv) King & Spalding LLP, as counsel to the Prepetition Term Agent and certain of the Prepetition Term Lenders; and (v) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.


*[Remainder of page intentionally left blank]*

**<u>CONCLUSION</u>**

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the

Debtors respectfully request that this Court enter interim and final orders, substantially in the forms

attached hereto, granting the relief requested in the Motion and such other and further relief as is

just and proper.

Dated:    February 3, 2019

**BAYARD, P.A.**

*/s/ Justin R. Alberto*
Justin R. Alberto (No. 5126)
Erin R. Fay (No. 5268)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: jalberto@bayardlaw.com
        efay@bayardlaw.com

- and -

**COOLEY LLP**
Seth Van Aalten
Michael Klein
Summer M. McKee
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
Email: svanaalten@cooley.com
        mklein@cooley.com
        smckee@cooley.com

*Proposed Co-Counsel for the Debtors*

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re

Charlotte Russe Holding, Inc., *et al.*,[1]

           Debtors.

Chapter 11

Case No.: 19-10210 (___)

(Joint Administration Requested)

**Re: Docket No. __**

## INTERIM ORDER AUTHORIZING (I) PAYMENT OF WAGES, COMPENSATION AND EMPLOYEE BENEFITS AND (II) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS

Upon the motion (the "Motion")[2] of Charlotte Russe Holding, Inc. and its chapter 11 affiliates, the debtors and debtors in possession (the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Cases"), for entry of an interim order (this "Interim Order"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing, but not requiring, the Debtors to (i) pay, in their sole discretion, the Employee Obligations, (ii) maintain and continue to honor their Employee Benefits as they were in effect on the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course (iii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing; and (iv) granting related relief; and upon consideration of the First Day

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Charlotte Russe Holding, Inc. (4325); Charlotte Russe Holdings Corporation (1045); Charlotte Russe Intermediate Corporation (6345); Charlotte Russe Enterprise, Inc. (2527); Charlotte Russe, Inc. (0505); Charlotte Russe Merchandising, Inc. (9453); and Charlotte Russe Administration, Inc. (9456). The Debtors' headquarters are located at 5910 Pacific Center Boulevard, Suite 120, San Diego, CA 92121.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

{BAY:03435537v1}

Declaration and the entire record of these Cases; and it appearing that the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that the Motion is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these Cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation, and good and sufficient cause appearing therefor, it is hereby **ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      The Debtors are authorized, but not required, to satisfy and honor, without further order of the Court, and in accordance with the Debtors' stated policies and procedures, all obligations with respect to the Employee Obligations and Employee Benefits.

3.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2019, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2019, and shall be served on: (i) the Debtors, 575 Florida Street, San Francisco, CA 94110 (Attn: Marie Satterfield), email: marie.satterfield@charlotterusse.com; (ii) proposed counsel for the Debtors, (x) Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036 (Attn: Seth Van Aalten, Esq. and Michael A. Klein, Esq.), email: svanaalten@cooley.com; mklein@cooley.com; and (y) Bayard P.A., 600 North King Street, Ste. 400, Wilmington, DE 19801 (Attn: Justin Alberto,

Esq. and Erin R. Fay, Esq.), email: jalberto@bayardlaw.com; efay@bayardlaw.com; (iii) counsel to Bank of America, N.A., as the Prepetition ABL Agent and the DIP Agent (x) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, MA 02110 (Attn: Julia Frost-Davies, Esq. and Christopher L. Carter, Esq.), email: julia.frost-davies@morganlewis.com; christopher.carter@morganlewis.com; and (y) Richards, Layton & Finger, PA, One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins), email: collins@rlf.com; (iv) counsel to Jefferies Finance LLC, as Prepetition Term Agent, and counsel to certain of the Prepetition Term Lenders, King & Spalding LLP, 1185 6th Avenue, New York, NY 10036 (Attn: Michael Rupe, Esq. and W. Austin Jowers, Esq.), email: mrupe@kslaw.com; ajowers@kslaw.com; (v) counsel to any statutory committee appointed in these Cases; (vi) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Jane Leamy), email: Jane.M.Leamy@usdoj.gov.  If no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without further notice or hearing.

4.      Notwithstanding anything in this Interim Order to the contrary, the Debtors are authorized, but not required, on an interim basis, to pay amounts owed prior to the Petition Date to the Debtors' Employees on account of Employee Obligations and Employee Benefits in accordance with the Debtors' stated policies and procedures as set forth in the Motion in an amount not to exceed $6.85 million; *provided* that the satisfaction of the Employee Obligations and Employee Benefits for any individual Employee shall not exceed $12,850 during the interim period; *provided further* that payment under the PTO Plans may not exceed $750,000 in the aggregate during the interim period.

5.      The Debtors are authorized, but not required, to continue to honor their practices, programs, and policies with respect to their Employees as such practices, programs, and policies were in effect as of the Petition Date.

6.      The Debtors are authorized, but not required, to pay costs and expenses incidental to the payment of the Employee Obligations and Employee Benefits, including all administration and processing costs and payments to outside professionals, independent contractors, or third-party vendors, in the ordinary course of business, in order to facilitate the administration and maintenance of the Debtors' programs and policies related to the Employee Obligations and Employee Benefits.

7.      The automatic stay is modified, pursuant to section 362(d) of the Bankruptcy Code, solely to the extent necessary to permit Employees to proceed with their claims under the Debtors' workers' compensation insurance policies in the appropriate judicial or administrative forum.

8.      The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Interim Order.

9.      Notwithstanding anything in this Interim Order to the contrary, any payment made or to be made under this Order, any authorization contained in this Interim Order, or any claim for

which payment is authorized hereunder, shall be subject to the requirements imposed on the Debtors under any orders approved by this Court approving any debtor-in-possession financing for, or any use of cash collateral by, the Debtors and any budget in connection therewith.

10.    Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed (i) an admission as to the validity or priority of, or a promise to pay with respect to, any claim against the Debtors or their estates, (ii) a waiver of the Debtors' right to dispute any claim on any grounds, (iii) a promise or requirement to pay any claim, (iv) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion, (v) a request or authorization to assume any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code, or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

11.    Nothing in this Interim Order shall be deemed to (i) authorize the payment of any amounts subject to section 503(c) of the Bankruptcy Code, (ii) authorize or approve any bonus plan or severance plan that is subject to section 503(c) of the Bankruptcy Code, or (iii) require the Debtors to cash out unpaid vacation or leave time upon termination of an employee unless applicable state law requires such payment.

12.    Bankruptcy Rule 6003(b) has been satisfied.

13.    Notwithstanding any provision in the Bankruptcy Rules to the contrary: (i) this Interim Order shall be effective immediately and enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Interim Order; and (iii) the Debtors are authorized and empowered, and may in their discretion and without further delay, take any action necessary or appropriate to implement this Interim Order.

14.     The Court retains jurisdiction with respect to all matters arising from or related to

the implementation or interpretation of this Interim Order.

Dated:     February _____, 2019
            Wilmington, Delaware


                                        _____
                                        United States Bankruptcy Judge

# **EXHIBIT B**

## **Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>Charlotte Russe Holding, Inc., *et al.*,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No.: 19-10210 (___)<br><br><br>(Joint Administration Requested)<br><br>**Re: Docket No. __** |

**FINAL ORDER AUTHORIZING (I) PAYMENT**
**OF WAGES, COMPENSATION AND EMPLOYEE**
**BENEFITS AND (II) FINANCIAL INSTITUTIONS TO HONOR AND**
<u>**PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**</u>

Upon the motion (the "<u>Motion</u>")[2] of Charlotte Russe Holding, Inc. and its chapter 11 affiliates, the debtors and debtors in possession (the "<u>Debtors</u>") in the above-captioned jointly administered chapter 11 cases (the "<u>Cases</u>"), for entry of a final order (this "<u>Final Order</u>"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), authorizing the Debtors to (i) pay, in their sole discretion, the Employee Obligations; (ii) maintain and continue to honor their Employee Benefits as they were in effect on the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course; (iii) authorizing banks and other financial institutions (collectively, the "<u>Banks</u>") to honor and process check and electronic transfer requests related to the foregoing; and (iii) granting related relief; and upon consideration of the First Day Declaration and the entire

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Charlotte Russe Holding, Inc. (4325); Charlotte Russe Holdings Corporation (1045); Charlotte Russe Intermediate Corporation (6345); Charlotte Russe Enterprise, Inc. (2527); Charlotte Russe, Inc. (0505); Charlotte Russe Merchandising, Inc. (9453); and Charlotte Russe Administration, Inc. (9456). The Debtors' headquarters are located at 5910 Pacific Center Boulevard, Suite 120, San Diego, CA 92121.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

record of these Cases; and it appearing that the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that the Motion is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these Cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation, and good and sufficient cause appearing therefor, it is hereby **ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not required, to satisfy and honor all Employee Obligations and Employee Benefits that arose prior to the Petition Date in accordance with the Debtors' stated policies and procedures as set forth in the Motion.

3.      The Debtors are authorized, but not required, to continue to honor their practices, programs, and policies with respect to their Employees as such practices, programs, and policies were in effect as of the Petition Date.

4.      The Debtors are authorized, but not required, to pay costs and expenses incidental to the payment of the Employee Obligations and Employee Benefits, including all administration and processing costs and payments to outside professionals, independent contractors, or third-party vendors, in the ordinary course of business, in order to facilitate the administration and

maintenance of the Debtors' programs and policies related to the Employee Obligations and Employee Benefits.

5.        The automatic stay is modified, pursuant to section 362(d) of the Bankruptcy Code, solely to the extent necessary to permit Employees to proceed with their claims under the Debtors' workers' compensation insurance policies in the appropriate judicial or administrative forum.

6.        The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Final Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Final Order.

7.        Notwithstanding anything in this Final Order to the contrary, any payment made or to be made under this Order, any authorization contained in this Final Order, or any claim for which payment is authorized hereunder, shall be subject to the requirements imposed on the Debtors under any orders approved by this Court approving any debtor-in-possession financing for, or any use of cash collateral by, the Debtors and any budget in connection therewith.

8.        Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed (i) an admission as to the validity or priority of, or a promise to pay with respect to, any claim against the Debtors or their estates, (ii) a waiver of the Debtors' right to dispute any claim on any grounds, (iii) a promise or

requirement to pay any claim, (iv) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion, (v) a request or authorization to assume any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code, or (vi) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

9.      Nothing in this Order shall be deemed to (i) authorize the payment of any amounts subject to section 503(c) of the Bankruptcy Code, (ii) authorize or approve any bonus plan or severance plan that is subject to section 503(c) of the Bankruptcy Code, or (iii) require the Debtors to cash out unpaid vacation or leave time upon termination of an employee unless applicable state law requires such payment.

10.     Bankruptcy Rule 6003(b) has been satisfied.

11.     Notwithstanding any provision in the Bankruptcy Rules to the contrary: (i) this Final Order shall be effective immediately and enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Final Order; and (iii) the Debtors are authorized and empowered, and may in their discretion and without further delay, take any action necessary or appropriate to implement this Final Order.

12.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Final Order.

Dated:    _____, 2019
          Wilmington, Delaware


                                        _____
                                        United States Bankruptcy Judge