**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| | ) Case No. 19-10210 (LSS) |
| CR Holding Liquidating, Inc., *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Hearing Date:  April 20, 2023 at 10:00 a.m. (ET)** |
| | ) **Obj. Deadline: April 13, 2023 at 4:00 p.m. (ET)** |
| | ) |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS (I) ESTABLISHING
DISMISSAL PROCEDURES, (II) AUTHORIZING DISMISSAL OF THE
DEBTORS' CHAPTER 11 CASES, (III) AUTHORIZING SALE OF REMNANT
ASSETS, (IV) PERMITTING OFFSET OF FURTHER FEES UNDER 28 U.S.C.
§ 1930(a)(6) AGAINST OVERPAYMENTS AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") for entry of orders, substantially in the forms attached hereto (the "Dismissal Procedures Order", and the "Dismissal Order", respectively, and together, the "Proposed Orders"): (a) approving certain procedures related to dismissal of the Debtors' chapter 11 cases (collectively, the "Chapter 11 Cases"), including with respect to the filing and approval of final fee applications by professionals retained in these chapter 11 cases (collectively, the "Professionals");   (b) dismissing the Chapter 11 Cases after such procedures are completed; (c) authorizing payment of Allowed Administrative Claims from available funds; (d) authorizing the Debtors to be dissolved in accordance with applicable state law and on the terms provided for in the Dismissal Procedures Order and Dismissal

---

[1]     The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: CR Holding Liquidating Inc. (f/k/a Charlotte Russe Holding Inc.) (4325); CR Holdings Liquidating Corporation (f/k/a Charlotte Russe Holdings Corporation) (1045); CR Intermediate Liquidating Corporation (f/k/a Charlotte Russe Intermediate Corporation) (6345); CR Enterprise Liquidating, Inc. (f/k/a Charlotte Russe Enterprise, Inc.) (2527); CR Liquidating, Inc. (f/k/a Charlotte Russe, Inc.) (0505); CR Merchandising Liquidating, Inc. (f/k/a Charlotte Russe Merchandising, Inc.) (9453); and CR Administration Liquidating, Inc. (f/k/a Charlotte Russe Administration, Inc.) (9456).  The Debtors' mailing address is 55 Hudson Yards, 42nd Floor, Attn. Summer McKee, New York, New York, 10025.

Order, respectively; (e) authorizing the sale of the Debtors' remnant assets; and (f) providing such other related relief as is just and necessary in connection with the relief sought herein.  In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    When the Debtors commenced the Chapter 11 Cases, they did so with the goal of implementing an expedited sale process which would build upon pre-petition marketing efforts and result in a series of value-maximizing transactions for the benefit of all creditors of their estates.

2.    Towards that end, on day one of these Chapter 11 Cases, the Debtors sought authority to move forward with sales transactions which would allow them to maximize the value of their remaining inventory, intellectual property, and other valuable assets.  Furthermore, just a few months into these cases, the Debtors retained ASK LLP to begin the complex process of pursuing avoidance actions on a contingency basis for the ultimate benefit of their creditors.

3.    Early estimates of potential recoveries related to the Debtors' preference claims combined with anticipated recoveries from the monetization of other assets would have provided sufficient funds to pay all priority creditors in full with the possibility of a small recovery to unsecured creditors.  However, the actual preference recoveries fell far below those estimates, leaving a significant shortfall in funds available to pay administrative claims.

4.    Additionally, the Debtors encountered unforeseeable delays in obtaining a considerable federal tax refund (the "2019 Tax Refund") in connection with the Debtors' 2019 tax filings.  The 2019 Tax Refund was anticipated to play a key role in paying administrative claims. Unfortunately, as further detailed below, these challenges in procuring the refund led to further delay in moving these Chapter 11 Cases forward.

5.    While attempting to overcome the challenges related to the 2019 Tax Refund, the Debtors worked to reconcile the administrative claims asserted against their estates, and filed seven

non-substantive and two substantive omnibus objections, each of which has been sustained by an order of this Court (D.I. 854, 855, 1519, 1520, 1521, 1522, 1523, 1524, and 1569).  Furthermore, the Debtors have negotiated and executed several settlements resolving motions seeking allowance of administrative claims.

6.      The Debtors and their Professionals, in consultation with the Official Committee of Unsecured Creditors appointed in these cases, have explored various options to bring these Chapter 11 Cases to a conclusion and concluded that dismissal is the most expeditious and cost-effective mechanism to wind down the Debtors' affairs.

7.      The Debtors are unable to pursue a confirmable chapter 11 plan because they do not have sufficient assets available to pay all administrative and priority creditors in full, nor a credible path to securing a non-insider, impaired consenting class.  The Debtors considered exiting the Chapter 11 Cases through a chapter 7 process but do not believe conversion would be value maximizing.  There is little for a chapter 7 trustee to do at this point and the additional fees, commissions and costs related to a chapter 7 conversion would diminish recoveries to administrative creditors.  In seeking approval of the dismissal of these Chapter 11 Cases pursuant to the Dismissal Procedures Order and Dismissal Order, respectively, the Debtors are mindful of the Supreme Court's decision in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) and the propriety of "structured" dismissals.  Accordingly, the Dismissal Procedures Order provides for distributions that comply with sections 507(a) and 726 of the Bankruptcy Code.

8.      As of the filing of the Motion, the remaining administrative claims against the Debtors' estates total approximately $3.6 million, and there will be approximately $1.9 million to distribute to such creditors.[2]  The Debtors propose the dismissal procedures set forth herein,

---

[2] As of the filing of this Motion, the Debtors anticipate receiving additional amounts in connection with certain state tax returns.  The timing of receipt of these refunds, however, is unclear, and the Debtors' tax professionals have warned

including making distributions to holders of valid, allowed claims arising under section 503(b) of the Bankruptcy Code, as reflected on **Exhibit C** attached hereto (such claims, collectively, the "Allowed Administrative Claims").

9.      For these reasons and as set forth more fully below, the Debtors respectfully submit that the relief sought by this Motion should be granted.

## JURISDICTION AND VENUE

10.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are pursuant to sections 105(a), 305, 349, 363(b)(1), 554(a), 726, and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 1017, 2002, 6007 and 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 1017-2.

---

that certain states may require additional documentation before such refunds may be issued.  While any additional state tax refund amounts received will be included in the amount made available to holders of Allowed Administrative Claims, in light of the administrative expenses the Debtors continue to incur, it would not be prudent to continue these Chapter 11 Cases to allow for all state tax refunds to be received.

## BACKGROUND

12.    The Debtors were a specialty fashion retailer of young women's apparel and accessories.

13.    On February 3, 2019 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

14.    On February 13, 2019, Region 3 of the Office of the United States Trustee appointed a seven-member Official Committee of Unsecured Creditors (the "UCC").  No trustee or examiner has been appointed.

15.    The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events precipitating the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Brian M. Cashman, Chief Restructuring Officer of Charlotte Russe Holding, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 3], which is fully incorporated herein by reference.

### I.    Secured Claims

16.    On the Petition Date, to fund these Chapter 11 Cases, the Debtors filed a motion [D.I. 15] (the "DIP Motion") seeking authority to utilize cash collateral on a consensual basis and borrow up to $50 million on a senior secured basis (the "DIP Facility") from certain of their Prepetition ABL Lenders (as defined in the DIP Motion) (the "DIP Lenders").  The DIP Facility consisted of (i) $16.4 million in new money loan commitments from the DIP Lenders, and (ii) a "roll-up" of approximately $33.6 million in the aggregate of prepetition amounts owed to the Prepetition ABL Lenders.

271482187 v3

17.     On March 7, 2019, the Court entered the *Final Order Authorizing the Debtors to (I) Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Provide Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, and (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [D.I. 320] (the "Final DIP Order"), by which it granted the DIP Motion on a final basis.  Pursuant to the Final DIP Order, the Debtors admitted, stipulated, and agreed, among other things, to the validity, perfection, priority, and enforceability of security interests granted to the Prepetition ABL Lenders and Prepetition Term Loan Lenders (each as defined in the DIP Motion).  *See* Final DIP Order, ¶¶ F(iii) and (vi).  Additionally, in the Final DIP Order, the Debtors admitted, stipulated, and agreed that (i) the prepetition secured claims held by the Prepetition ABL Lenders totaled $25 million in outstanding revolving loans and approximately $11 million in issued and outstanding letter of credit obligations, and (ii) the prepetition secured claims held by the Prepetition Term Loan Lenders totaled approximately $89.3 million.  *See id.* at ¶ F(ii) and (v).

18.     As of the filing of this Motion, no obligations remain outstanding under the DIP Facility.  Rather, as a result of the various sale transactions detailed below, the Debtors were able to repay amounts borrowed in connection with the DIP Facility in full as of March 7, 2019.

19.     Furthermore, as the result an investigation conducted by the UCC which uncovered, in the UCC's view, certain infirmities in the validity, perfection, and priority of the Prepetition Term Loan Obligations, as well as certain potential causes of action based on the same, the UCC and Debtors were able to negotiate a settlement with the Prepetition Term Loan Agent (the "Prepetition Term Loan Settlement").  Pursuant to the Prepetition Term Loan Settlement, the Prepetition Term Loan Agent agreed that, among other things, the Prepetition Term Loan Obligations would be deemed non-priority unsecured claims for all purposes in these Chapter 11 Cases and subordinated in all respects to all other non-priority unsecured claims (the "General Unsecured Claims") with

6

respect to the first $4 million to be distributed to creditors on account of allowed General Unsecured Claims.  On December 17, 2019, the Court entered an order [D.I. 1148] approving the Prepetition Term Loan Settlement.

## II.    Sale Transactions

20.    On the Petition Date, the Debtors filed the *Combined Motion for Entry of an Order (I) Approving Bid and Sale Procedures, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts, and Unexpired Leases, and (IV) Scheduling an Auction and Sale Hearing* [D.I. 17].  The Court approved the bidding procedures portion of such motion on February 21, 2019 [D.I. 199].  Thereafter, the Debtors held an auction on March 5, 2019, where SB360 Capital Partners, LLC was declared the winning bidder for certain of the Debtors' merchandise and inventory.  The sale to SB360 Capital Partners, LLC was approved by order entered on March 7, 2019 [D.I. 319] (the "Sale Order").  Through the Sale Order, the Debtors received net proceeds of $56.45 million, which amounts were used to pay off the remaining Prepetition ABL Obligations, cash collateralize outstanding letters of credit, and pay outstanding amounts due under the Debtors' leases, including stub rent.

21.    Also upon commencement of these cases, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Commencement/Continuation of Store Closing Sales in Accordance with the Store Closing Agreement and Sale Guidelines, with Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances; (II) Authorizing the Assumption of the Store Closing Agreement; and (III) Granting Related Relief* [D.I. 14], which the Court approved on a final basis by order entered on March 6, 2019 [D.I. 311] (the "Store Closing Order").  Pursuant to the relief granted by the Store Closing Order, the Debtors liquidated certain

of their inventory through their brick-and-mortar locations and consumer website (the "Store Closing Sales").  Through the Store Closing Sales, the Debtors received net proceeds of $10 million.

22.     Following entry of the Sale Order and the Store Closing Order, the Debtors continued to work with their advisors to identify potential buyers for their valuable intellectual property ("IP"), and, on March 18, 2019 and March 19, 2019, filed supplemental sale motions [D.I. 367, 369] seeking, among other things, authority to sell the Charlotte Russe brand IP and, in a separate transaction, the IP related to the Debtors' Peek children's brand (together, the "IP Sale Transactions").  On March 27, 2019, the Court entered orders approving the IP Sale Transactions [D.I. 422, 423].  Through the IP Sale Transactions, the Debtors received net proceeds of $5.2 million.

23.     After the IP Sale Transactions closed, the Debtors focused on marketing and selling their limited remaining assets, monetizing certain causes of actions, including avoidance actions, and continuing to wind down these Chapter 11 Cases.  The Debtors were able to recover approximately $1.8 million in net proceeds from avoidance actions as compared to initial estimates of approximately $9.8 million to $11.1 million (before accounting for contingency fees).

24.     Recoveries from the Debtors' preference claims were dramatically below the initial estimates, and, combined with the disappointing results of the Store Closing Sales and IP Sale Transactions, it became challenging for the Debtors to devise a path forward which would allow for payment in full of administrative claims.

25.     Moreover, the Debtors experienced unforeseeable delays in recovering the 2019 Tax Refund.  While the related federal tax returns were timely filed, the pandemic interceded and led to a near complete inability to obtain information from the Internal Revenue Service ("IRS") as to when and where the 2019 Tax Refund would be issued.  To make matters worse, once the Debtors persevered in connecting with the appropriate party at the IRS, they discovered the refund had been

8

issued several months prior but was seemingly lost in transit. While the Debtors immediately took action as directed by the IRS, the reissuance process was opaque and lengthy. These unfortunate circumstances were entirely outside the Debtors control and led to extreme delays, while simultaneously increasing administrative expenses (stemming primarily from electronic data storage) which continued to offset the anticipated benefit of this refund. The 2019 Tax Refund in the amount of $721,347.00 was finally received on October 30, 2022.

26. Once the 2019 Tax Refund was received, however, it came to the Debtors' attention that there no longer existed an active bank account for the Debtor to whom the check had been issued. Unfortunately, opening a new account in that Debtor's name required the Debtors to clear further administrative hurdles and caused further delays. Having successfully addressed the requirements set forth by Bank of America, N.A., the new bank account became active and the 2019 Tax Refund was deposited on February 18, 2023.

27. Ultimately, as a result of disappointing recoveries related to the Debtors' preference claims and inordinate delays in obtaining the 2019 Tax Refund, the Debtors were forced to abandon any hopes of confirming a plan of liquidation in these cases and pivot to a wind-down process. The Debtors have had no operations and no employees for nearly two years and, in an effort to avoid administrative fees related to the same, have already begun the process of destroying certain books and records pursuant to relief granted by this Court in the *Order Granting Debtors Motion For Entry Of An Order Authorizing The Destruction, Abandonment, Or Other Disposal Of Certain Non-Essential Books, Records, And Documents* [D.I. 1568]. The Debtors now seek dismissal of these Chapter 11 Cases in an effort to efficiently bring these matters to a close and maximize the recovery available to holders of Allowed Administrative Claims.

28. In a continued effort to fully realize any value remaining in the estates for the benefit of creditors, the Debtors have determined there might exist property of the Debtors'

bankruptcy estates consisting of known or unknown assets or claims, which have not been previously sold, assigned, or transferred (collectively, "Remnant Assets"). Such potential Remnant Assets might include unscheduled refunds, overpayments, deposits, judgments, claims, or other payment rights that would accrue in the future. The Debtors solicited offers for the Remnant Assets from certain parties known to purchase these types of assets. The Debtors then negotiated an Asset Purchase Agreement in the form attached hereto as **Exhibit D** (the "Remnant Asset APA") pursuant to which the Debtors propose to sell the Remnant Assets to the highest bidder, Oak Point Partners, LLC ("Oak Point"), a private investment firm that specializes in the acquisition of residual assets from bankruptcy cases, for $25,000.[3]

29.    While the Debtors remain confident that the process pursued in connection with the sale transactions described herein, prosecution of the avoidance actions, and the proposed Remaining Assets sale represent the best possible outcome under the trying circumstances of these Chapter 11 Cases, the fact remains that the consideration received in return for the Debtors' assets is not sufficient to pay administrative claims in full, and there simply are no avenues available for further recoveries. For this reason, the Debtors have determined that dismissal of these Chapter 11 Cases is in the best interests of all stakeholders.

## RELIEF REQUESTED

30.    By this Motion, the Debtors respectfully request (i) the entry of the Dismissal Procedures Order, establishing procedures for dismissal of the Chapter 11 Cases, and (ii) upon the filing of a certification of counsel stating that the conditions precedent to dismissal have been met, entry of the Dismissal Order, pursuant to sections 105(a), 349, 554, and 1112(b) of the Bankruptcy

---

[3] The Remnant Asset APA includes a carve out for state tax refunds relating to the tax years of 2016 through 2021 which are received within one year of execution of the agreement so that any such amounts received may be included in distributions to holders of Allowed Administrative Claims.

Code, Bankruptcy Rules 1017(a), 2002, and 6007, and Local Rules 1017-2 and 2002-1, dismissing

the Chapter 11 Cases and granting related relief.

## BASIS FOR RELIEF REQUESTED

**III.    The Court Must Dismiss These Chapter 11 Cases if the Elements for "Cause" Are Shown Under Section 1112(b)(4) of the Bankruptcy Code.**

31.    Upon request of a party in interest, section 1112(b)(1) of the Bankruptcy Code

provides that, absent unusual circumstances, a court "shall" dismiss a chapter 11 case (or convert

such case to a case under chapter 7) "for cause." *See* 11 U.S.C. § 1112(b)(1).  The Bankruptcy

Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the statutory

language with respect to conversion and dismissal from permissive to mandatory.[4]  *See* H.R.

REP. No. 109-31, pt. 1 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 94 (stating that BAPCPA

"mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best

interests of creditors and the estate, if the movant establishes cause, absent unusual

circumstances."); *see also In re Gateway Access Solutions, Inc.,* 374 B.R. 556, 560 (Bankr.

M.D. Pa. 2007) (stating that the amendments to section 1112 limit the court's discretion to

refuse to dismiss or convert a chapter 11 case upon a finding of cause).

32.    For the reasons explained below, the Debtors respectfully submit that the Court

must dismiss these Chapter 11 Cases because cause exists and dismissal is in the best interests of

the Debtors, their estates, and their creditors.

---

[4] Prior to BAPCPA, a bankruptcy court had wide discretion to use its equitable powers to dispose of a debtor's case but was not mandated to dismiss a case if cause were shown. H.R. REP. No. 95-595 (1977); S. REP. No. 95-989 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787; *see also Small Bus. Admin.* V. *Preferred Door Co. (In re Preferred Door Co.),* 990 F.2d 547, 549 (10th Cir. 1993) (a court has broad discretion to dismiss a bankruptcy case*); In re Sullivan Cent. Plaza I, Ltd.,* 935 F.2d 723, 728 (5th Cir. 1991) (determination of whether cause exists under § 1112(b) "rests in the sound discretion" of the bankruptcy court); *In re Koerner,* 800 F.2d 1358, 1367 (5th Cir. 1986) (bankruptcy court is afforded "wide discretion" under section 1112(b)).

271482187 v3

**IV.    Cause Exists to Dismiss These Chapter 11 Cases Because the Debtors Ceased Their Business Operations and Have Insufficient Assets to Confirm a Plan.**

33.    Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of sixteen (16) grounds for dismissal.  11 U.S.C. § 1112(b)(4)(A)-(P); *see also In re Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)).[5]

34.    One statutory basis to dismiss a case is where a party in interest shows that (i) there has been a "loss" or "diminution" of value of the estate and (ii) the debtor does not have "a reasonable likelihood of rehabilitation."  *See* 11 U.S.C. § 1112(b)(4)(A).  Under this two-fold inquiry, the debtors must first demonstrate that there has been a diminution of value of their estates. *See, e.g.*, *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) (finding that accumulation of real estate taxes impaired the value of the estate).  Second, the Debtors must demonstrate that they have no "reasonable likelihood of rehabilitation."  *See, e.g.*, *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (dismissal warranted where "the absence of financial data and certain sources of income for the [debtors] indicate[d] the absence of a reasonable likelihood of rehabilitation").

35.    Here, the Debtors easily satisfy the two-fold inquiry.  First, the Debtors liquidated substantially all of their assets in connection with the avoidance actions, Sale Order, Store Closing Sales and the IP Sale Transactions, and the Debtors' remaining marketable assets will be sold upon

---

[5]  In *In re TCR of Denver,* the court recognized the apparent typographical error in § 1112(b)(4) of the Bankruptcy Code. The sixteen illustrative examples of "cause" set forth in that section are linked by the word "and" after subsection (0).  Accordingly, strict construction of the statute would require that a debtor establish all of the items constituting "cause" before a case can be dismissed by the court.  The *TCR* court held that Congress could not have intended to require a "perfect storm" of all sixteen (16) circumstances listed before a case be converted or dismissed. *See In re TCR of Denver,* 338 B.R. at 499.

approval and consummation of the Remnant Asset APA.  To be clear, the Debtors no longer conduct any business – and have not for well over two years – and have no remaining assets that could be used to satisfy the claims of any class of creditors other than the distributions proposed to be made to holders of Allowed Administrative Claims in connection with dismissal of these Chapter 11 Cases.  At the same time, administrative claims continue to accrue each day the Chapter 11 Cases remain open.  At bottom, there is presently no business to reorganize, no assets left to monetize, and only expenses to accrue.

36.    Moreover, while no longer an enumerated ground under amended section 1112 of the Bankruptcy Code, dismissal of a chapter 11 case is appropriate where the court finds that a feasible plan is not possible.  *In re 3 Ram*, 343 B.R. at 117–18.  If a chapter 11 debtor cannot achieve a reorganization within the statutory requirements of the Bankruptcy Code, then there is no point in expending estate assets on administrative expenses.  *Id.* at 118 (citing, inter alia, *In re Brown*, 951 F.2d at 572).

37.    Here, the Debtors do not have sufficient assets to confirm a plan of liquidation because the Debtors no longer have any operations and have no remaining assets to fund the payments that would be required under such a plan.  Thus, the Debtors will remain unable to consummate a liquidating plan, and there is no point in continuing to incur additional administrative expenses and further depleting the Debtors' estates.

38.    In sum, the Debtors have met their burden of demonstrating that these Chapter 11 Cases should be dismissed under section 1112(b)(4) of the Bankruptcy Code due to the substantial or continuing loss to, or diminution of, the Debtors' estates, the absence of a reasonable likelihood of rehabilitation, and the fact that a liquidating plan is not feasible under the circumstances of these Chapter 11 Cases.

271482187 v3

**V.    Dismissal Is in the Best Interests of the Debtors' Creditors and Estates.**

39.    Once a court determines that cause exists to dismiss a debtor's chapter 11 case, the court must then evaluate whether dismissal is in the best interests of the debtor's creditors and the estate.  *See, e.g.*, *Rollex Corp. v. Associated Materials, Inc. (In re Super. Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994) ("Once 'cause' is established, a court is required to consider this second question of whether to dismiss or convert.").  A variety of factors demonstrate that it is in the best interest of the Debtors' estates and their creditors to dismiss these Chapter 11 Cases.

40.    First, a dismissal of a chapter 11 bankruptcy case meets the "best interests of creditors" test where a debtor has nothing to reorganize and the debtor's assets are fixed and liquidated.  *See Camden Ordinance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordinance Mfg. Co. of Ark, Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage business which ceased business was unfeasible); *Royal Trust Bank, N.A. v. Brogdon Inv. Co. (In re Brogdon Inv. Co.)*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (court dismissed chapter 11 proceeding in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).  As explained above, the Debtors have nothing left to reorganize because substantially all of their assets and operations have either already been liquidated or will be liquidated upon approval and consummation of the proposed Remnant Asset APA, and the balance of cash remaining in the Debtors' estates is insufficient for payment in full of Allowed Administrative Claims, let alone any distribution to other creditors of these estates pursuant to a chapter 11 plan or upon conversion to chapter 7.

41.    Second, the "best interests of creditors test" is met where a debtor demonstrates the ability to oversee its own liquidation.  *See Camden Ordinance,* 245 B.R. at 798; *Mazzocone,* 183 B.R. at 412 ("Only when a Chapter 11 debtor has no intention or ability to . . . perform its own liquidation . . . should a debtor not be permitted to remain in bankruptcy . . . .").  As described

14

above, the Debtors have conducted a variety of processes to dispose of substantially all of their assets, which maximized the value of those assets and liquidated them in a rapid and orderly fashion. Accordingly, the Debtors have demonstrated that they are capable of overseeing their own liquidation, to the extent this factor applies.

42.     Third, and finally, dismissal is appropriate where, as here, it will maximize the value of the Debtors' estates because the alternative—conversion to chapter 7 and appointment of a trustee—is (i) unnecessary and would provide no benefit to creditors and (ii) would impose significant additional administrative costs upon the Debtors' estates without any meaningful source of funds to satisfy such costs.  Under the circumstances, a chapter 7 trustee would have extremely limited funds, if any, to satisfy additional claims arising after conversion to cases under chapter 7 of the Bankruptcy Code.  As explained above, substantially all of the Debtors' assets have been liquidated.  At this point, the Debtors have no prospect of generating additional funds with which to pay administrative claims in full.  By continuing in bankruptcy under chapter 7 (or chapter 11), the Debtors would merely incur additional administrative expenses that they would be unable pay. Thus, the Debtors submit that a dismissal pursuant to section 1112 of the Bankruptcy Code is in the best interests of the Debtors' estates and their creditors.

43.     In balancing the equities of the Debtors' Chapter 11 Cases, the Debtors submit that it is in the best interests of their estates and creditors to dismiss these Chapter 11 Cases.

## VI.    The Proposed Dismissal Complies with Applicable Law Governing Distributions.

44.     The proposed dismissal complies with applicable law governing distributions of estate property.  Specifically, a final disposition "in connection with the dismissal of a Chapter 11 case cannot, without the consent of the affected parties, deviate from the basic priority rules" contained within the Bankruptcy Code.  *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978 (2017).  In other words, a debtor may not use a dismissal as a means to distribute assets to a favored

15

class of "low-priority general unsecured creditors" while "skipping" a disfavored class that would otherwise be entitled to priority of payment under a plan of liquidation. *See id.* As it applies here, the Bankruptcy Code requires distributions first be made to holders of allowed secured claims (from the property or proceeds of such property on which they hold liens).

45.     Here, neither the Dismissal Procedures Order nor the Dismissal Order provide for the distribution of estate property to any parties other distributions to holders of Allowed Administrative Claims. After such payments are made, there are no proposed distributions to be made of estate property to any party. Accordingly, the prohibition under *Jevic* and related concerns about "class skipping" are not applicable to these Chapter 11 Cases or the relief sought in this Motion.

**VII.     The Court Should Authorize, But Not Require, Dissolution of the Debtors.**

46.     Because the Debtors have sold substantially all of their assets and ceased operations, the Debtors intend for their corporate entities to be dissolved as soon as reasonably practicable upon entry of the Dismissal Order. Courts in this jurisdiction have previously authorized the dissolution of debtors by court order in connection with the dismissal of a chapter 11 case, in accordance with applicable state law. *See, e.g.*, *In re Quantum Foods, LLC*, Case No. 14-10318 (KJC) (Bankr. D. Del. Apr. 6, 2018) [D.I. 1798]; *In re Sunco Liquidation, Inc.*, Case No. 17-10561 (KG) (Bankr. D. Del. Aug. 18, 2017) [D.I. 706]; *In re TAH Windown, Inc.*, Case No. 16-11599 (MFW) (Bankr. D. Del. Jan. 13, 2017) [D.I. 408]; *In re Hospitality Liquidation I, LLC*, Case No. 13-12740 (BLS) (Bankr. D. Del. Jan. 5, 2015) [D.I. 447].

47.     It is appropriate and necessary for the Court to authorize the dissolution of the Debtors. The Debtors have no further business to conduct and no other purpose in remaining active as corporate entities in their respective jurisdictions. The Debtors may incur additional taxes and statutory fees owing to their continued corporate existence absent their prompt dissolution.

16

Accordingly, it is in the best interests of the Debtors' estates for the Debtors to dissolve as soon as practicable following entry of the Dismissal Order.

**VIII.    All Prior Releases, Stipulations, Settlements, Rulings, Orders and Judgments Should Remain Binding and Should Continue to Have Full Force and Effect.**

48.    The Debtors request that all orders of this Court entered in these Chapter 11 Cases remain in full force and effect and survive the dismissal of these Chapter 11 Cases.  Pursuant to section 349 of the Bankruptcy Code, the dismissal of a chapter 11 case ordinarily vacates all orders previously entered by the bankruptcy court and restores all parties to the prepetition status quo. *See* 11 U.S.C. § 349(b).  However, a bankruptcy court may "for cause, order[] otherwise" *Id*.  "[T]his provision appears to be designed to give courts the flexibility to 'make the appropriate order to protect rights acquired in reliance on the bankruptcy case.'" *Cyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017).  Courts in this jurisdiction have regularly maintained the enforceability of orders, including those approving releases and settlements, after a dismissal, notwithstanding section 349 of the Bankruptcy Code.  *See, e.g.*, *In re Sunco Liquidation, Inc*., Case No. 17-10561 (KG) (Bankr. D. Del. Nov. 6, 2017) [D.I. 865] (giving continued effect to orders entered throughout the pendency of the chapter 11 cases); *In re Old Towing Co.*, Case No. 17-10249 (LSS) (Bankr. D. Del. May 30, 2017) [D.I. 381] (giving continued effect to 363 sale order and any releases, injunctions and successor liability provisions provided for in such sale); *In re TAH Window, Inc.*, Case No. 16-11599 (MFW) (Bankr. D. Del. Jan. 13, 2017) [D.I. 408] (giving orders, releases, and injunctions continuing effect).

49.    The Debtors submit that cause exists to allow all orders, rulings, and settlements entered by the Court during these Chapter 11 Cases to remain in full force, notwithstanding the dismissal of these Chapter 11 Cases.  The Debtors have been in chapter 11 for over four years and, during that period, the Debtors have sought and obtained this Court's approval for a number of

transactions, including the Final DIP Order, the Sale Order, the Store Closing Order and orders authorizing the IP Sale Transactions, and have negotiated and now seek the Court's approval for the proposed Remnant Asset APA.  Unless this Court orders otherwise, section 349 of the Bankruptcy Code would unravel the effect of these orders, and all other substantive orders, entered by this Court in these Chapter 11 Cases.  By allowing all orders of this Court to remain in full force and effect and survive dismissal, the Court will protect the significant transactions that have occurred in these Chapter 11 Cases and preserve the benefits and rights bestowed on the parties to those transactions.

## IX.    The Certification Process and the Request for Entry of Dismissal Order Is Reasonable Under the Circumstances.

50.    In connection with the winding down of the Debtors' estates and the dismissal of these Chapter 11 Cases, the Debtors seek (i) approval of certain procedures governing the time by which each professional retained in these cases (each a "Retained Professional") must file a final fee application (each, a "Final Fee Application"),[6] and (ii) a hearing date from the Court to resolve any potential disputes in connection with each Final Fee Application.  Specifically, the Debtors request that each Retained Professional, within thirty (30) days after entry of the Dismissal Procedures Order (the "Final Fee Application Deadline"), file a Final Fee Application for: (a) requested compensation for professional services and reimbursement of expenses incurred from the Petition Date through and including April 30, 2023; and (b) compensation and reimbursement requested for estimated professional fees and expenses that are expected to be incurred between May 1, 2023 and the anticipated dismissal date; provided that each Retained Professional shall be required, by 4:00 p.m. (prevailing Eastern Time) on the date that is seven (7) days prior to the

---

[6] NTD – Summer/Katie do you have a preference whether we should we just file final apps (or apps through x date say Oct 31) with the dismissal motion and then do a supplement or stick to this structure? I have a slight preference for filing an app through x date or a final app subject to supplementation with the dismissal motion.

hearing on the Final Fee Application, to file a supplement to its Final Fee Application setting forth the actual fees and expenses incurred by such professional during the period from May 1, 2023 through and including the date of the filing.

51.    As soon as is reasonably practicable after the completion of (i) the closing of the proposed Remnant Asset APA, (ii) approval of Final Fee Applications, (iii) distributions to holders of Allowed Administrative Claims the Debtors request that the Court dismiss these Chapter 11 Cases upon the Debtors filing of a certification of counsel (the "Certification") requesting entry of the Dismissal Order.  Among other things, the Certification will verify that: (i) all quarterly fees of the U.S. Trustee not offset by amounts which have been previously overpaid by these estates have been paid in full and all monthly operating reports have been filed; (ii) the Allowed Administrative Claim distributions have been made; and (iii) the Remnant Asset APA has closed.  The Dismissal Order will cause the dismissal of the Chapter 11 Cases immediately upon entry.  The Debtors intend to serve the Certification on the U.S. Trustee, the Committee, all holders of Allowed Administrative Claims, and all entities that have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (collectively, the "Dismissal Order Notice Parties"), but will not send the Certification or a notice thereof to all of the Debtors' creditors, equity holders, and remaining parties-in-interest, as such parties will receive reasonable notice of the proposed dismissal through notice of the hearing on the present Motion.

## NOTICE

52.    Notice of this Motion has been given to: (a) the U.S. Trustee, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (attn: Jane M. Leamy), email: jane.m.leamy@usdoj.gov; (b) counsel to the UCC, (c) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (d) all entities listed on the Debtors' creditors' matrix,

which includes all holders of Administrative Claims.   In light of the nature of the relief requested

herein, the Debtors respectfully submit that no further notice of this Motion is required.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request entry of orders, granting the relief

requested herein and such other and further relief as the Court may deem just and proper.

Dated: March 30, 2023
   Wilmington, Delaware

        **BAYARD, P.A.**

        */s/  Daniel N. Brogan*
        Daniel N. Brogan (No. 5723)
        600 N. King Street, Suite 400
        Wilmington, Delaware 19801
        Telephone: (302) 655-5000
        Facsimile: (302) 658-6395
        E-mail:  dbrogan@bayardlaw.com

        - and -

        **COOLEY LLP**
        Cathy Hershcopf
        Summer M. McKee
        55 Hudson Yards
        New York, New York 10001
        Telephone: (212) 479-6000
        Facsimile: (212) 479-6275
        E-mail:  chershcopf@cooley.com
           smckee@cooley.com

        *Counsel to the Debtors and Debtors in Possession*

271482187 v3